IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-10777
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

        versus

YSIDRO CASTILLO, JR, aka Curly,
aka Big Un, GARY RHUDY, THOMAS
CHARLES BROWN, aka Big One,
THOMAS CHARLES BROWN, JR, aka
Little One, CHARLES DUANE BROWN,
MICHAEL CASTILLO and DAVID CASTILLO,

                                        Defendants-Appellants,


_____

        Appeals from the United States District Court for the
                    Northern District of Texas
_____

                        March 11, 1996

Before GARWOOD, E. GARZA and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

        Defendants-appellants (defendants) were convicted of one count

of conspiring to possess with the intent to distribute marihuana in

violation of 21 U.S.C. § 846.  Defendant-appellant David Castillo

was additionally found guilty of a second count of possession with

intent to distribute approximately thirty-two pounds of marihuana

in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(D) and 18 U.S.C.

§ 2.  Defendants now appeal their respective convictions and

sentences.  We affirm.

**Facts and Proceedings Below**

I.  Charles Ballard's Testimony

On March 13, 1993, Charles Ballard (Ballard) was arrested for possession of a box containing marihuana in the trunk of his car. Ballard thereafter agreed to cooperate with law enforcement officials in an effort to apprehend the persons for whom Ballard was allegedly transporting the marihuana. Seven persons were subsequently arrested, and, in the ensuing trial, Ballard testified to the following facts.

From approximately February 1992 until March 1993, Ballard transported marihuana by automobile from Dallas, Texas, to Dayton, Ohio. During this period, Ballard made between twenty and thirty such trips, transporting some two hundred to two hundred fifty pounds of marihuana each trip.[1] Generally, Ballard's routine was to contact someone from the "Castillo group"—comprised of defendants Ysidro Castillo, Jr., David Castillo, Michael Castillo and Gary Rhudy—upon his arrival in the Dallas area; after meeting with one of these defendants, usually David Castillo, Ballard would wait in a motel for someone to contact him and let him know that a marihuana shipment was ready for transport back to Dayton, Ohio. After returning to Dayton with the marihuana, Ballard would contact someone from the "Brown group"—consisting of defendants Thomas Brown, Sr., Thomas Brown, Jr., and Duane Brown—and arrange for a

---

[1]  Ballard testified that he transported less than this amount of marihuana on his first two trips, and that he remembered transporting as much as two hundred eighty pounds on another trip.

2

pick-up of the marihuana. Thomas Brown, Jr. usually gave Ballard instructions to make the trips to Dallas, and Duane Brown was most often the defendant who picked up the shipments upon Ballard's arrival in the Dayton area.

The marihuana was packaged in garbage bags. Often it was weighed in Ballard's presence by David and Ysidro Castillo, who would thereafter instruct Ballard to inform Thomas Brown, Sr. and Thomas Brown, Jr. of the weights.

On his first trip from Dayton to Dallas in February 1992, Ballard was accompanied by Thomas Brown, Jr.[2] Upon their arrival in Dallas, Brown contacted David Castillo. Ballard and Brown subsequently went to David Castillo's residence, where the three men loaded three or four bags of marihuana—a total of 144 pounds—into the trunk of Ballard's car. Ballard and Brown then returned to Dayton, where they unloaded these bags of marihuana and placed them in the room at the Holiday Air Motel where Ballard lived. Thomas Brown, Sr. then arrived at the motel to check the quality of the marihuana. During the following week, Ballard weighed the marihuana and packaged it in one-pound bags. Ballard stored the bags in his room at the motel, and the "Brown group" picked up bags as they needed them, usually by sending Duane Brown. Ballard learned from discussions with members of the "Brown group" that these one-pound bags were sold in Ohio for $1,350, and that

---

[2] The 1979 Plymouth Volare driven by Ballard originally belonged to Thomas Brown, Sr., but was transferred from the name of Thomas Brown, Sr.'s girlfriend, Diana Markunes, to Ballard's name.

3

the "Castillo group" was paid $750 per pound.

Ballard was sent to Dallas for a second shipment roughly one week following his return to Dayton from the first trip. During this second trip, David Castillo helped Ballard load approximately two hundred pounds of marihuana into Ballard's car. On his return, Ballard settled into the pattern that would come to characterize his return to Dayton from these trips, calling someone in the "Brown group"—in this case, Thomas Brown, Sr.—and then packaging and storing the marihuana in his Dayton motel room for the Browns to pick up as needed.

In addition to picking up marihuana from David Castillo's home,[3] Ballard also loaded marihuana into his car for transport to Ohio in the garage of the home of defendant Gary Rhudy and his wife, Silvia, who was the sister of David, Michael, and Ysidro Castillo. At the Rhudys' home, marihuana was weighed and packaged in twenty-pound parcels. At least once, Ballard received assistance loading his car at the Rhudy home from David and Ysidro Castillo. Ballard also picked up marihuana at David Castillo's place of work, and at Ysidro Castillo's home, both in Arlington, Texas.

On at least six occasions, Ballard transported sums of money from the "Brown group" to the "Castillo group." Usually, Thomas Brown, Jr. gave Ballard the money—bundled with rubber bands in

---

[3]    On at least one occasion, Ballard received assistance from Michael Castillo in loading marihuana at David Castillo's residence in Hutchins, Texas.

$5,000 quantities—but Ballard received payment for the "Castillo group" at least once from Thomas Brown, Sr. Thomas Brown, Sr. also gave Ballard money on one occasion so that Ballard might pay his rent. However, it was usually David Castillo who paid Ballard for making these trips, giving Ballard as much as $2,000 to $3,000.

In March 1992, Ballard was visited by David Castillo and Thomas Brown, Jr. At a bar, the three men discussed Ballard's trips.[4]

On December 30, 1992, Thomas Brown, Jr. took Ballard's 1987 Mercury Marquis and gave him a 1985 Mercury Marquis to take on a trip to Dallas the following day. During this trip, Ballard witnessed Michael Castillo driving the 1987 Mercury Marquis near West Memphis, Arkansas. After reaching Duncanville, Texas—in the Dallas area—David Castillo instructed Ballard to fly back to Dayton and leave the 1985 Mercury Marquis in Texas.

In mid-January 1993, after meeting in Dayton with Thomas Brown, Jr. and Michael and David Castillo, Ballard and Michael Castillo drove to Dallas. Ballard had been instructed to make a pick-up, which Thomas Brown, Sr. coordinated.

Ballard returned to Dallas on January 14, 1993, and followed

---

[4] Law enforcement officials had discovered this connection between David Castillo and the "Brown group" prior to this March meeting. Officers with the Drug Interdiction Unit at the Dayton, Ohio airport had "profiled" David Castillo on February 17, 1993, after Castillo had purchased a one-way ticket to Dallas using cash. Castillo had been sitting in the Dayton airport with two persons who left the airport in a Camaro registered to Duane Brown. After leaving the airport, one of these persons got out of the Camaro and into a pickup truck registered to Thomas Brown, Jr.

5

David Castillo to Ysidro Castillo's home in Arlington, where he picked up another shipment.

Ballard made his last trip (driving from Dayton to Dallas, and then carrying marihuana from Dallas back to Dayton) in March 1995. During that trip, Ballard met with Ysidro, David and Michael Castillo at the Lace Club in Arlington, Texas, where Ballard was given one hundred one dollar bills. Later during that trip, while riding in a jeep, Ballard agreed to continue working for Michael and Ysidro Castillo, both of whom apparently had some reservations about David Castillo. On the morning of March 10, 1993, Ballard and David Castillo picked up a box containing approximately thirty pounds of marihuana at the home of Enrique Castillo. David Castillo informed Ballard that the small size of this shipment was meant to reflect the "Castillo group's" dissatisfaction with the "Brown group's" delinquency in making their payments.[5]

Ballard left the Dallas area bound for Dayton on March 12, 1993. He was arrested that day.

Subsequent to his arrest, and in accordance with his agreement

---

[5]  In early 1993, law enforcement officials combined their efforts to apprehend the defendants. In February 1993, officials identified the telephone number of David Castillo's mobile telephone. On March 8, 1993, officials observed Ballard talking with Ysidro, David, and Michael Castillo at the Lace Club in Arlington, Texas; while at the Lace Club, they also observed Ysidro Castillo hand to Ballard a large stack of currency. Continuing their surveillance of Ballard, officials witnessed and photographed a meeting between Ballard and David Castillo the following day. Subsequently, officials observed Ballard, together with Michael and Ysidro Castillo in a jeep, doing "heat runs" in the automobile in an effort to detect if they were being followed. The next morning, officials observed Ballard and David Castillo drive to the home of Enrique Castillo and place a box into their automobile.

to cooperate with law enforcement officials, Ballard proceeded to Dayton with the box of marihuana and acted upon his instructions from officials to make a "controlled delivery." Ballard telephoned Thomas Brown, Sr., Thomas Brown, Jr., Duane Brown, and David Castillo on the day he arrived in Dayton, and each of these conversations was recorded.[6]

Following these conversations, Thomas Brown, Sr. visited Ballard at his motel room. After learning that Ballard was in possession of only thirty pounds of marihuana, Brown stated that it was not enough to "mess with" and left.

Later that evening, Duane Brown arrived at Ballard's motel room and the two men moved the box of marihuana from Ballard's car to Brown's. Brown then gave Ballard $500 and left with the

---

[6] In his conversation with Thomas Brown, Sr., Ballard—using the agreed-to "code"—informed Thomas Brown, Sr. that he had arrived in Dayton with a shipment, and asked when they should meet: "Lets play . . . What time do you want to tee off?" Thomas Brown, Sr. responded, "Just stay there." In a subsequent conversation, Ballard told Duane Brown that he had "[b]rought back about thirty dozen golf balls. . . . Thought we'd play." Duane Brown's response indicated to Ballard that Duane and Thomas Brown, Jr. wished to keep the news of Ballard's possession of marihuana from their father: after asking Ballard if he had talked to "Dad," Duane Brown said, "Tell him you misunderstood him. . . . no balls at all . . . Tommy will call you." Duane called Ballard back and told Ballard not to say anything about their conversation and indicated that Ballard was going to receive two pounds of marihuana. Not long thereafter, Thomas Brown, Jr. called Ballard and asked if his father knew that Ballard was in possession of marihuana; he then stated, "I just wanted to know what Dad knew cause I was just going to keep that for, . . . and do it myself . . . I'll send Duane over there and take care of you. . . . I'm supposed to give you something."

7

marihuana.[7]

Also later on the night of March 13, 1993, Ballard called David Castillo and told him that the amount of marihuana in the box had not been enough for "Big One", but that "Little One" had taken it.[8] Ballard understood Castillo's response to mean that a load of marihuana would need to be picked up for Thomas Brown, Sr. later that week. Additionally, when Ballard informed Castillo that he had received only $500 for his role in the most recent shipment, Castillo responded in a way that indicated to Ballard that Castillo planned to contact Thomas Brown, Jr. and instruct Brown to give Ballard another $500.[9]

On March 14, 1993, Thomas Brown, Sr. telephoned Ballard and asked Ballard to come to his home. When Ballard arrived, Brown spoke about Duane Brown's arrest and advised Ballard that, since Ballard might also be under surveillance, he should leave town for a while. After leaving Brown's home, Ballard followed instructions from law enforcement officials and telephoned David Castillo,

---

[7] Law enforcement officials conducting surveillance of Ballard's motel observed (1) Duane Brown's arrival at the motel, (2) a short conversation between Ballard and Duane Brown, and (3) the transfer of the box containing marihuana from Ballard's car to Brown's car. Officials arrested Duane Brown later that evening after Brown attempted to open the box. One pound of marihuana was in the box, along with the telephone books that officials had used to replace twenty-nine pounds of the marihuana when Ballard agreed to perform the "controlled delivery."

[8] David Castillo responded, "Well, that's all right. Well, we'll take care of Big One come this week."

[9] David Castillo's response was, "I'll talk to him today and tell him to give you another five . . . I told him to give you one."

informing him about Duane Brown's arrest.[10]

On March 17, 1993, Ballard went to Dallas at the direction of law enforcement authorities. During the week he stayed in Dallas, Ballard had telephone conversations with David Castillo and Thomas Brown, Sr., telling both that he was in Georgia. David Castillo discussed his intentions of getting the money from the "Brown group" that he believed was overdue. Thomas Brown, Sr. revealed to Ballard that the "Brown group" harbored certain suspicions regarding Ballard in light of the fact that Ballard had not been arrested and that the police had a videotape of certain events.

On March 29, 1993, Ballard met with David Castillo and Gary Rhudy at a restaurant parking lot in Ohio. During this meeting, Ballard gave David Castillo general directions to Thomas Brown, Jr.'s lake house in Russells Point, Ohio; Castillo wanted to speak with Brown about his overdue debts. Also, Castillo agreed to set up a delivery for Ballard—who claimed that he needed work—to an unspecified third party.[11]

---

[10]  In response, David Castillo told Ballard to stay in his room and to quit telephoning him; Castillo also advised Ballard that he would travel to Dayton soon, and that he would tell "him" (Thomas Brown, Jr.) to give Ballard "about five" ($500).

[11]  On May 10, 1993, David Castillo had an intercepted conversation with Ballard in which Castillo asked Ballard, "You ready to go to work?" After indicating a reluctance to deal with Thomas Brown, Jr., Castillo stated that he was willing to work with "Big One" (Thomas Brown, Sr.), that "He (Ysidro Castillo) wants you to come down," and that he would find out "when he (Ysidro Castillo) wants you here." In a later conversation on the same day, Castillo told Ballard that "I'm gonna hear from him in the morning. . . . Just sit tight . . . I'll call you." On May 13, 1993, Castillo and Ballard continued their discussion concerning this anticipated shipment.

Sometime thereafter, Ballard met with David and Ysidro Castillo at the Lace Club in Arlington, Texas, to discuss a trip to Ohio. Ysidro Castillo told Ballard that he would probably agree to work with the "Brown group" if a deal could be arranged to his satisfaction. On May 20, 1993, Ballard and Ysidro Castillo drove around and continued this discussion.[12]

In his next meeting with Ysidro and Michael Castillo, Ballard was able to persuade the Castillos that Duane Brown had asked him to keep the DPS tapes. Apparently believing this story, the Castillos discussed their anticipated marihuana deal with the "Brown group" and gave Ballard approximately $120.[13]

On May 27, 1993, Ballard and David Castillo met at a restaurant in Arlington, Texas, and discussed Castillo's suspicions of Ballard. The two men were joined by Ysidro Castillo in the parking lot and the three continued this conversation. The Castillos noted that they had observed police officers all around

---

[12] Law enforcement officials conducted surveillance of this meeting. Additionally, on May 23, 1993, agents intercepted a telephone conversation between Thomas Brown, Jr. and David Castillo in which Brown warned Castillo that, "We just found out [Ballard is] working for the narcotics squad in Dallas." Brown explained that blank cassette tapes issued by the Department of Public Safety had been uncovered under Ballard's bed with a recorder. Castillo responded, "I'm gonna get hold of Big'un today . . . I'll let him know about that [sic] what you just told me."

[13] Following this conversation between the Castillos and Ballard, law enforcement officials observed Ysidro and Michael Castillo in a car registered to Silvia Rhudy at the motel where Ballard was staying.

Ballard.[14]  The Castillos voiced their concern that Ballard was, at the very least, being followed by law enforcement officials.

II.  Evidence Seized

In a search of the home of Thomas Brown, Sr., law enforcement officials seized two telephone books and a cassette tape with a Texas Department of Public Safety label that was identical to the five or six tapes that had been issued to Ballard.  It was the discovery of these tapes in Ballard's room that purportedly compromised Ballard's role as an informant.

In a search of the home of Thomas Brown, Jr., officials seized the certificate of title to a 1979 Plymouth Volare registered to Charles Ballard and showing Diana Markunes, Thomas Brown, Sr.'s girlfriend, as the previous owner.  A handwritten letter was also seized, which letter stated:

> "What's up Tommy?  Just a few lines to let you know to get in touch with me.  I talked to Ralph and he told me to reach you.  I thought you might want to look me up. Call me at Donna, Texas, 512-464-3620 or Dave Castillo's, 214-225-4406 or write me back at Curly [Ysidro] Castillo, Route 1, Box 316-M, Donna Texas 78537."

Written on the back of this letter was "214-296-9230," the telephone number of the Royal Inn in Duncanville, Texas.  "Room 209" was also written on the back of this letter.  This was the room that Ballard checked into on March 19, 1992.  Officials

---

[14]  On June 2, 1993, David Castillo called Thomas Brown, Jr.  In this intercepted conversation, Castillo told Brown, "And Brother said, 'Well, I don't need him.' I said, 'Whatever, we don't need him.' . . . He told me to howler at you, see what y'all wanted to do.  Y'all want to fish we can go or I can go up there and we'll talk about it."

additionally seized a letter to which were attached ads for kits used to detect wiretaps, and a piece of paper on which was written "214-698-1452, Dave, 5:30."

In a search of the home of Ysidro Castillo, officials seized an electronic and a manual scale, both of the type used to weigh drugs. Subsequent analysis of these scales uncovered trace amounts of cocaine on both. Officials also seized rubber bands of the type used to band money and $2,301 in currency.

In a search of the home of Michael Castillo, officials seized a gray suitcase that held fourteen clear plastic bags containing a total of 18.10 pounds of marihuana. One of Ysidro Castillo's fingerprints was later discovered on one of these bags. Officials also found in the home a .357 revolver and ammunition, an address book, and documents containing suspected drug notes.

In a search of the home of Gary Rhudy, officials seized a tote bag containing 10.06 ounces of marihuana and pieces of cardboard on which handwritten notations had been made in black and red ink.[15] Discovered on these pieces of cardboard were .22 grams of marihuana. Ysidro Castillo and Gary Rhudy were present at Rhudy's home at the time of this search.

Finally, at the time of his arrest, David Castillo was in possession of a briefcase that contained the telephone numbers of Thomas Brown, Sr., Thomas Brown, Jr., and Ballard, as well as receipts and appraisals for a $4,848 Rolex watch, a $1,100 pendant,

---

[15] Agent Tramel testified that these markings matched the "drug notes" seized at the home of Michael Castillo.

and a $3,525 ring.

III. DEA Special Agent Doug Tramel's Testimony

Agent Tramel was called as a government witness to testify regarding evidence compiled through the use of: (1) a wiretap of David Castillo's home and mobile telephones, and (2) pen registers authorized for the telephones of other defendants. Agent Tramel, together with other agents, constructed "summary charts" of the evidence so obtained; these charts included telephone numbers, pen register numbers, dates, and times. Agent Tramel testified that the records from which the "summary chart" information was taken were also in evidence.

The government created these "summary charts" in an effort to supplement the testimonial evidence against the defendants with documented telephone calls, dates, and times. As the (DEA) administrative agent in charge of the wiretap and author of these charts, Agent Tramel was called to testify regarding these summaries of the voluminous records already in evidence. In the course of this "summarization," however, Agent Tramel offered considerable testimony that did not directly bear on these "summary charts." In fact, Agent Tramel "summarized" portions of the live testimony previously introduced in the government's case, doing so in the context of discussing, among other topics, the activities of Ballard and Ysidro Castillo—following the placement of a telephone call—in loading approximately 250 pounds of marihuana.[16]

---

[16] In relevant part, the transcript of Agent Tramel's testimony on this point reads:

IV.  Jim Spencer's Testimony

> "Q:   He calls the same one?
>
> A:    Calls the same number.
>
> Q:    And then what happens later that day, sir?
>
> A:    Charles Ballard goes to Ysidro Castillo, Jr.'s house and he, David—he and David and Ysidro load approximately 250 pounds of marijuana.
>
> Ms. Hewins:    Your Honor, I object.  This is hearsay.  This gentleman was not present, and he has no personal knowledge.
>
> Ms. Romero:    Your Honor, this is summary testimony.
>
> The Court:    All right.  Sustained—I mean, overrule the objection.  He may answer that.
>
> Q:    All right.  Now, Charles Ballard and Ysidro Castillo and David Castillo load up a load of marijuana, approximately 250 pounds; is that correct?
>
> A:    Yes, ma'am, that is correct.
>
> Q:    And this is on 11/25/92?
>
> A:    Yes, ma'am, that is correct."

Later in the course of Agent Tramel's testimony, counsel for Ysidro Castillo made the following objection:

> "Ms. Hewins:    Your Honor, I renew my objection at this time under Rule 1006.  The purpose of the chart and purpose of summary testimony is to summarize voluminous documents.  It is not to permit or to summarize the testimony of another individual."

Joining in this contention, counsel for Thomas Brown, Jr. clarified that his objection was to Agent Tramel's testimony as to how Thomas Brown, Jr. obtained possession of Ballard's Mercury Marquis:

> "Q:   On 12/30/92, what happened, sir?
>
> A:    As Ballard—Mr. Ballard testified, Tom, Jr. picked up his vehicle at the Holiday Motel in Ohio.
>
> Q:    Picked up whose vehicle?
>
> A:    Picked up Mr. Ballard's '87 Lincoln Marquis."

14

Navarro County Sheriffs' Captain Jim Spencer also testified regarding certain "summary charts" of telephone company toll and subscriber records already admitted into evidence. Specifically, Captain Spencer detailed (1) telephone calls charged to David Castillo—made to Ohio, (2) calls charged to Michael Castillo—made to and from Ohio, and (3) calls charged to Gary and Sylvia Rhudy—made from Kentucky, Arkansas, and Ohio.

V.    Disposition in Court Below

On August 8, 1994, a jury found Ysidro Castillo, Jr., David Castillo, Michael Castillo, Thomas Charles Brown, Sr., Thomas Charles Brown, Jr., Charles Duane Brown, and Gary Rhudy guilty of conspiring—together with Charles Ballard, Sherill Raper,[17] and Enrique Castillo—to distribute and to possess with intent to distribute (1,000 kilograms or more of) marihuana. The jury additionally found David Castillo guilty of possession with intent to distribute approximately thirty-two pounds of marihuana.

Accordingly, the district court sentenced the defendants as follows:  (1) Ysidro Castillo, Jr.—216 months; (2) David Castillo—188 months on count one of the indictment and sixty months on count two, to run concurrently; (3) Michael Castillo—168 months; (4) Thomas Brown, Sr.—216 months; (5) Thomas Brown, Jr.—230 months; (6) Duane Brown—136 months; and (7) Gary Rhudy—121 months.

---

[17]  Ballard testified that, on May 14, 1993, at Thomas Brown, Sr.'s direction, he went to Houston, Texas, to pick up a shipment of marihuana.  In Houston, Ballard met with Sherill Raper.  However, because Raper's suppliers would not agree on a price, Ballard left Houston without picking up any marihuana.

15

The sentences of Thomas Brown, Sr., Ysidro Castillo, and David Castillo were enhanced, pursuant to U.S.S.G. § 3B1.1(a), based on their roles as organizational leaders.  Additionally, the court imposed five-year terms of supervised release against each of the defendants.

All seven defendants gave timely notice of appeal.

## Discussion

I.   Denial of Motions for Severance

Defendants[18] argue that the district court prejudiced their rights by denying the Browns'[19] pretrial motions for severance.  We review the district court's denial of these motions for an abuse of discretion.  *United States v. Thomas*, 12 F.3d 1350, 1363 (5th Cir.), *cert. denied*, 114 S.Ct. 1861 (1994).

Citing *United States v. Prewitt*, 34 F.3d 436, 440 (7th Cir. 1994), the defendants contend that their conflicting and irreconcilable differences, the massive amount of complex evidence (impossible for the jury to separate by defendant), the incriminating statements made by a co-defendant, and the gross

---

[18]  While Thomas Brown, Sr., Thomas Brown, Jr., and Duane Brown have jointly filed a single brief on appeal, Ysidro Castillo, David Castillo, Michael Castillo, and Gary Rhudy have filed individual briefs.  However, each defendant specifically adopts all of the applicable points of error raised by the other defendants.

[19]  Thomas Brown, Jr. and Duane Brown filed pretrial motions for severance, and Thomas Brown, Sr. joined in the oral motions for severance presented after the government rested.  As Thomas Brown, Sr.'s failure to move for severance before trial resulted in a waiver of that request, we consider only the district court's denial of Thomas Brown, Jr.'s and Duane Brown's motions for severance.  *See* Fed. R. Crim. P. 12(b)(5) and (f).

16

disparity of evidence between defendants necessitated severance in this case, and the district court's failure to grant the Browns' pretrial motions therefore constituted reversible error.

We need not address the Seventh Circuit's decision in *Prewitt*, however, as it is clear that those criteria have not been established in the present case. First, the defendants' conflicting and irreconcilable differences, if any, existed in the operation of their drug scheme, and not within the context of their defense. Second, while the defendants do assert that the considerable amount of complex evidence presented at trial would "blur" in the minds of the jurors, they articulate no reasonable support for this assertion;[20] moreover, in *Thomas*, we observed that "the mere presence of a spillover effect does not ordinarily warrant severance." 12 F.3d at 1363 (citation omitted). Third, there was no incriminating statement by a co-defendant admitted at trial that would not have been admissible in (post-severance) separate trials, and Ballard's testimony would have been available in any event. Finally, this Court has clarified that "a quantitative disparity in the evidence 'is clearly insufficient in itself to justify severance.'" *Id.* (citation omitted).

Furthermore, while there does not appear to have been any such conflict in the present case, we held in *Thomas* that severance is

---

[20] There is no merit to the defendants' suggestions that the piecemeal nature of the government's presentation of its case and the shared surnames of the defendants would render the jury's efforts to "compartmentalize" the evidence—as required by *Prewitt*—"impossible."

17

not automatically required merely because co-defendants present mutually antagonistic defenses. *Id.* Determinations concerning the risk of prejudice in this context must generally be left to the sound discretion of the district court if we are to give any weight to the rule that "persons indicted together should be tried together, especially in conspiracy cases." *Id.* (quoting *United States v. Pofahl,* 990 F.2d 1456, 1483 (5th Cir.), *cert. denied*, 114 S.Ct. 266 (1993)).

Finally, even if some not overwhelming risk of prejudice had resulted from the district court's denial of the motions for severance, the court properly instructed the jury that: (1) the verdict as to each defendant should be based solely on the evidence about that defendant; and (2) membership in a conspiracy must be shown by a defendant's own acts and statements. These instructions, which the jury is generally presumed to have followed, reduced any such risk of prejudice. *Id.*

## II. Fatal Variance

Defendants contend that, while the indictment alleged a single conspiracy, the evidence presented at trial demonstrated the existence of multiple conspiracies. More specifically, defendants argue that the government's evidence proved the existence of several conspiracies, but did not prove that each defendant agreed with one or more of his co-defendants to participate in all of these conspiracies; therefore, a fatal variance existed between the indictment (and jury charge)——which contemplated a single conspiracy—and the evidence adduced at trial.

18

The district court expressly instructed the jury that:

". . .**Multiple Conspiracies**
You must determine whether the conspiracy charged in the indictment existed, and, if it did, whether the defendant was a member of it.  If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed.  If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy."

"[J]uries are presumed to follow their instructions."  *United States v. Thomas*, 12 F.3d 1350, 1363 (5th Cir.) (citation omitted), *cert. denied*, 114 S.Ct. 1861 (1994).  Furthermore, a jury's finding that the government proved a single conspiracy must be affirmed unless the evidence——and all reasonable inferences which may be drawn—examined in the light most favorable to the government would preclude a finding by reasonable jurors of a single conspiracy beyond a reasonable doubt.  *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989).

This Court has previously held that, in determining the number of conspiracies proved at trial, the principal factors to consider are: (1) the existence of a common goal, (2) the nature of the scheme, and (3) overlapping participants in the various dealings. *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987). In the present case, there was sufficient evidence to support the jury's finding of the single conspiracy alleged in the indictment. Between February 1992 and March 1993, Ballard made approximately twenty to thirty trips between Texas and Ohio, transporting shipments of marihuana and currency.  Thomas Brown, Sr. and Thomas

19

Brown, Jr. took primary responsibility for instructing Ballard when to make trips to Texas. Duane Brown was most often the person from the "Brown group" who would pick up the marihuana from Ballard once a trip from Texas had been completed, occasionally helping Ballard with the unloading as well. David Castillo was Ballard's principal contact in Dallas, often relaying information and instructions between Ballard and Ysidro Castillo. Ysidro Castillo, together with David and Michael Castillo, assisted in the various functions related to the weighing and loading of marihuana for Ballard's trips back to Ohio. Gary Rhudy permitted marihuana to be stored, weighed, packaged, and loaded into Ballard's vehicle in the garage of his home.

Thus, between February 1992 and March 1993, each of the defendants played some role in facilitating the transportation of more than 1,000 kilograms of marihuana from Ohio to Texas for distribution. Throughout this enterprise, the suppliers, the mode of transport, and the purchasers remained constant. Therefore, the jury could reasonably infer the existence of a single conspiracy involving all of the defendants. *See United States v. Puig-Infante*, 19 F.3d 929, 936 (5th Cir.), *cert. denied*, 115 S.Ct. 180 (1994). Furthermore, in light of the court's instruction regarding "multiple conspiracies," even if there had been some risk of prejudice resulting from this alleged variance between the indictment and some of the evidence adduced, the defendants were adequately shielded from such risk.

III. Insufficiency of the Evidence

A.   A Single Conspiracy

As discussed, *supra*, the government presented sufficient evidence to support the jury's reasonable inference that the defendants participated in the single conspiracy charged.  To adduce sufficient evidence that each defendant engaged in this single narcotics conspiracy, the government was required to prove beyond a reasonable doubt: (1) the existence of an agreement between two or more of the defendants to violate narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intentionally joined in it, and (3) that each alleged conspirator voluntarily participated in the conspiracy.  *United States v. Crain*, 33 F.3d 480, 485 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1142 (1995).  In this case, the evidence which supported the jury's finding of a single conspiracy—evidence of the defendants' repeated, coordinated, and extensive facilitation of large shipments of marihuana and currency between Ohio and Texas—also sufficiently demonstrates that each defendant knowingly and voluntarily joined in this marihuana trafficking with the common goal of profiting therefrom by the continued necessary cooperation of the parties to the ongoing scheme.  Following the analytical framework of *United States v. Morris*, 46 F.3d 410, 415-17 (5th Cir.), *cert. denied*, 115 S.Ct. 2595 (1995), we conclude that the evidence supports a finding of conspiracy as alleged.

B.   Gary Rhudy Shown to Be a Co-conspirator

Rhudy argues that the evidence presented by the government failed to demonstrate that he had knowledge of, and voluntarily

participated in, the alleged conspiracy. Rhudy does, however, concede that the government adduced evidence that: (1) Ballard was in the garage at Rhudy's home "on occasion";[21] (2) Rhudy was with David Castillo in Ohio at a meeting between Ballard and Castillo concerning the conspiracy; (3) Rhudy's wife, Silvia, was the sister of Ysidro, David, and Michael Castillo; (4) a number of telephone calls between members of the conspiracy were charged to Rhudy's home and credit card; (5) pieces of cardboard displaying handwriting, matching the drug notes seized at Michael Castillo's home, were found in the Rhudys' garage; and (6) marihuana was seized in the Rhudys' garage, Rhudy being present.

We review this contention to determine whether, after viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found that Rhudy was a knowing and voluntary conspirator beyond a reasonable doubt. *United States v. Triplett*, 922 F.2d 1174, 1177 (5th Cir.), *cert. denied*, 111 S.Ct. 2245 (1991). The evidence adduced at trial was sufficient to support the jury's verdict that Rhudy was such a participant in the alleged conspiracy. "A defendant need only have had a minor role in the conspiracy, once it is shown that he voluntarily agreed to participate." *United States v. McKinney*, 53 F.3d 664, 672 (5th Cir.), *cert. denied*, 116 S.Ct. 261 (1995).

IV. Findings and Conclusions at Sentencing

    A.   Adjustments for Defendants' Roles in the Conspiracy

---

[21] Ballard testified that marihuana was stored, weighed, packaged, and loaded into his vehicle in the Rhudys' garage.

Thomas Brown, Sr., Ysidro Castillo, and David Castillo argue that the district court erred when it upwardly adjusted their respective sentences to reflect their organizational or leadership roles in the conspiracy. At sentencing, the court adopted the recommendations made in the presentence investigation reports (PSRs) prepared for Thomas Brown, Sr. and Ysidro Castillo and increased their respective base offense levels by four levels pursuant to U.S.S.G. § 3B1.1(a); the court thereby concluded that Thomas Brown, Sr. and Ysidro Castillo were——as stated in their PSRs—"organizer[s] or leader[s] of a criminal activity that involved five or more participants or [] otherwise extensive." Concluding, however, that David Castillo was a "manager or supervisor (but not an organizer or leader)" pursuant to § 3B1.1, the court departed from the recommendation made in David Castillo's PSR and increased his base offense level by only three levels.

We review the district court's findings in this context for clear error. *United States v. Narvaez*, 38 F.3d 162, 166 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1803 (1995). In addition to Ballard's testimony regarding the roles of these defendants, *supra*, the district court considered the following information from the PSRs of these defendants: (1) Thomas Brown, Sr. participated in the decision to hire Ballard, instructed Ballard regarding when to make trips to Texas, served as Ballard's principal contact upon Ballard's return from Texas with marihuana, gave Ballard instructions as to what to do with the marihuana, and funded an attempt to purchase two hundred pounds of marihuana from a third

party in Houston, Texas; (2) Ysidro Castillo was the leader of the organization in Texas, also storing marihuana in his home and assisting in the loading of marihuana; (3) David Castillo was one of the leaders of the Dallas organization, relaying instructions to Ballard, generally assisting Ysidro Castillo, and also participating in the loading of marihuana.[22]  In light of the evidence before the district court, the court's findings were not clearly erroneous.

Michael Castillo argues that the district court's refusal to depart downwardly two levels from his base offense level——pursuant to U.S.S.G. § 3B1.2(b)——in consideration of his professed minor participation in the conspiracy constituted clear error.  However, in *United States v. Tremelling*, 43 F.3d 148 (5th Cir. 1995), this Court held that a district court should not make an adjustment for minor participation merely because the defendant's participation is somewhat less than the other participants'; to warrant such a downward adjustment, the defendant's participation must be "enough less so that he at best was peripheral to the advancement of the illicit activity."  *Id.* at 153.  In *Tremelling*, we held that the defendant's actions in bringing the buyers and sellers together for the transaction were not "peripheral" so as to merit a downward departure.  *Id.*  Therefore, considering the evidence of Michael

---

[22]  In relying on these PSRs, as well as the testimony at trial concerning these defendants' respective roles in the conspiracy, the district court did not deny these defendants due process. *United States v. Montoya-Ortiz*, 7 F.3d 1171, 1180 (5th Cir. 1993).

Castillo's participation in this conspiracy,[23] the district court's decision not to make a downward adjustment was not clearly erroneous.

B. Quantity of Drugs Attributable to Defendants

The defendants contend that the district court failed to make the specific findings required to attribute to each defendant the entirety of the 1,000 kilograms of marihuana alleged in the indictment.[24] At the Browns' sentencing hearing, counsel for Thomas Brown, Jr. objected to the "findings of the Court," but failed to specify the grounds for his objection—assuming such an objection was incorporated within this general challenge—to the court's findings regarding the quantity of marihuana attributable to Thomas

---

[23] The evidence adduced at trial, together with the observations in Michael Castillo's PSR, presented the following details of his participation: Michael Castillo (1) assisted in the loading of marihuana on at least one occasion, (2) made at least one trip to Ohio—in an automobile ordinarily used by Ballard to ship marihuana, (3) was present at one meeting with Ballard, Ysidro Castillo, and David Castillo and at another with only Ballard and Ysidro Castillo, (4) purchased a 1993 Chevrolet Corvette for which Ysidro Castillo made a ($18,000) cash deposit, and (5) was in possession of approximately 18 pounds of marihuana and a firearm when law enforcement officials searched his residence.

[24] The district court adopted the recommendations set out in the defendants' respective PSRs concerning the quantities of marihuana attributable to each defendant for sentencing purposes: (1) Thomas Brown, Sr.—3,574 pounds (included 200-pound transaction in Houston); (2) Thomas Brown, Jr.—3,374 pounds; (3) Duane Brown—3,374; (4) Ysidro Castillo—4,974 pounds (included 200-pound transactions in Arkansas and Michigan); (5) David Castillo—4,574 pounds; (6) Michael Castillo—4,592 pounds (included the 18 pounds of marihuana seized during the search of his home); (7) Gary Rhudy—4,574 pounds. These (PSR) recommendations were based on the premise, stated in each PSR, that the Castillos as a whole were responsible for 4,574 pounds of marihuana, and the Browns were collectively responsible for at least 3,374 pounds of marihuana.

25

Brown, Jr.

In *United States v. Clark*, 67 F.3d 1154 (5th Cir. 1995)*, petition for cert. filed*, No. 95-7511 (Jan. 16, 1996), this Court observed that, under the sentencing guidelines, a defendant who participates in a drug conspiracy is accountable for the quantity of drugs that is attributable to the conspiracy and reasonably foreseeable to the individual defendant. *Id.* at 1164. The district court must therefore make two findings: (1) the quantity of drugs attributable to the entire conspiracy; and (2) the quantity of drugs that each defendant knew or should have known was involved in the conspiracy. *See United States v. Quiroz-Hernandez*, 48 F.3d 858, 870 (5th Cir. 1995).

At the Browns' sentencing hearing, the district court held that:

> "So based on all of the evidence that I have before me and the evidence that I heard at trial, particularly the evidence that I heard at trial, and also the fact that it is obviously clear the Castillos were moving large amounts of marijuana based on the notes and the evidence that was found, and a lot of it was going up to Dayton. And so while we can't determine a precise amount, I believe it is a finding that I can make by a preponderance, based on all of the evidence that I heard, including especially the evidence at trial, that at least 1,000 kilograms made their way up to Dayton and that these defendants were involved in that amount of marijuana trafficking.
>
> So that will be the finding of the Court, that each of these defendants jointed [sic] the conspiracy from the beginning as alleged in the indictment, this February 1992 date; that they were members of the conspiracy from that date through the end of the conspiracy as alleged in the indictment; that the amounts of marijuana that they were involved in was in excess of 1,000 kilograms.
>
> That certainly their levels of involvement are different . . . But that the amounts were within the

26

scope, this 1,000 kilograms was within the scope of the agreements that were entered into in the conspiracy that were entered into by these defendants of which they were a part, and that these amounts were also reasonably foreseeable to these defendants without knowing the exact amounts, as they don't have to know, they knew what was going on, that they were involved in marijuana trafficking, and so the amounts were within the scope of the agreement and reasonably foreseeable to each of the defendants."

Similarly, at the sentencing hearing for Ysidro Castillo, David Castillo, and Gary Rhudy, the district court concluded that the quantities of marihuana recommended in the PSRs were properly attributable to these defendants as "within the scope of the agreement" and "reasonably foreseeable" to them.[25]

At Michael Castillo's sentencing hearing, the district court concluded that Michael Castillo had been involved throughout the duration of the conspiracy, and that it was reasonably foreseeable to him—and within the scope of his agreement with the other defendants—"that at least a thousand kilograms of marijuana would be trafficked by [his] family."

We review these findings by the district court for clear error. *See United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994). In making these findings, the district court expressly drew upon corroborated testimony that Ballard transported shipments of marihuana on at least eighteen occasions. Ballard further

---

[25] With regard to Gary Rhudy, the court determined that he joined the conspiracy in July 1992, so only 2,400 pounds of the marihuana involved in the greater conspiracy (commenced in February 1992) were attributable to him.

testified that these shipments averaged from 200 to 250 pounds.[26] Additionally, the government adduced considerable evidence demonstrating that each defendant was a voluntary and knowing participant in the conspiracy.

Furthermore, the district court's findings in the defendants' respective sentencing hearings were clearly adequate and sufficiently specific to comply with U.S.S.G. § 1B1.3.[27] "Where there is no drug seizure or the amount seized does not reflect the scale of the offense . . ." the sentencing guidelines recognize that a district court must approximate the quantity of drugs at issue. U.S.S.G. § 2D1.1 comment. (n.12). In the present case, the district court set forward its computations in estimating the quantities of marihuana attributed to the conspiracy and to the individual defendants. Based on the evidence before the court, and in light of the fact that the vast majority of the marihuana involved in this conspiracy was never seized, the district court's findings of fact—estimating the quantities of drugs attributable to the individual defendants—were not clearly erroneous.

V.    Instruction That Jury Need Not Determine Quantities

---

[26] These 18 corroborated marihuana shipments would not have to have averaged much more than 120 pounds in order for the total amount of marihuana to have exceeded 1,000 kilograms.

[27] Thomas Brown, Sr. and Thomas Brown, Jr. filed written objections to the quantities of marihuana attributed to them in their respective PSRs; the district court adopted these PSRs (as clarified) in determining the defendants' sentences; Michael Castillo, Gary Rhudy, David Castillo, Ysidro Castillo, and Duane Brown also objected to the quantities of marihuana attributed to them in the addenda to their respective PSRs.

The defendants contend that the district court erred by instructing the jury that the evidence need not establish that the quantity of marihuana was as alleged in the indictment, but only that a measurable amount of marihuana was involved with regard to the acts charged in the indictment. Specifically, the defendants argue that the 1,000 kilogram quantity of marihuana alleged in the indictment constituted an element of the offense, which the jury would need to find beyond a reasonable doubt. The court's instruction was proper.[28] We have held that "[q]uantity is not an element of the crimes proscribed by 21 U.S.C. § 841(a)(1) or 846," and only need be established for sentencing purposes. *United States v. Valencia*, 957 F.2d 1189, 1197 (5th Cir.), *cert. denied*, 113 S.Ct. 254 (1992).

VI. Evidence of Solicitation of a False Statement

Ysidro Castillo contends that the district court erred in admitting evidence that he solicited a false statement. Michael Perryman testified that he sold a 1993 Chevrolet Corvette to Michael Castillo on July 27, 1993. While title to the Corvette was taken in Michael Castillo's name, it was Ysidro Castillo who gave Perryman a shoe box containing $18,000 in currency as a down payment against the ($33,698.11) purchase price of the vehicle. Sometime after the indictment was returned (July 29, 1993) but before the middle of August 1993, Ysidro Castillo asked Perryman to: (1) contact a certain law enforcement official and inquire

---

[28] We assume, *arguendo*, that there was adequate objection below.

into what could be done to retrieve the Corvette, which had been seized; and (2) state that Perryman had accompanied Ysidro Castillo to the bank, where Castillo withdrew the $18,000 down payment.

At trial, but outside the presence of the jury, counsel for Ysidro Castillo objected to Perryman's testifying regarding Ysidro Castillo's request that Perryman fabricate a story about accompanying Castillo to the bank to withdraw cash for the down payment. The district court ruled this testimony to be relevant and admissible. We review this evidentiary ruling for abuse of discretion. *United States v. Lopez*, 979 F.2d 1024, 1032 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 2349 (1993). Perryman's testimony was properly admitted as tending to show Ysidro Castillo's "knowledge of and membership in the conspiracy." *United States v. Sullivan*, 578 F.2d 121, 123 (5th Cir. 1978). It is well-settled that, "In developing proof of intent and motive, the prosecution may offer all of the surrounding circumstances that were relevant." *United States v. Dula*, 989 F.2d 772, 777 (5th Cir.), *cert. denied*, 114 S.Ct. 172 (1993). Ysidro Castillo's request that Perryman fabricate this story about the bank demonstrated Castillo's consciousness of guilt, and was clearly relevant to the government's contention that Ysidro Castillo knowingly participated in this conspiracy. *Id.*

VII. Prejudicial Statements by a Juror

Defendants argue that the district court erred in failing to dismiss the jury panel or declare a mistrial after one jury panel member allegedly stated to another that all of the defendants were

drug dealers—and that the defendants were also all guilty—at a time when the entire panel was seated in the courtroom.[29]  On the same morning, this juror was later observed by defense counsel speaking to other panel members and pointing towards the defendants in the hall outside of the courtroom.  Defense counsel brought this information to the attention of the district court after *voir dire*, and the court questioned both the jury panel member who allegedly had made the statement and a panel member who had been seated nearby.  Both testified that they had no knowledge of the alleged statement, and the court concluded that no such statement had been made.

Granting of a mistrial is largely within the discretion of the trial judge, and this discretion extends to the type of investigation required.  *United States v. Khoury*, 539 F.2d 441, 443 (5th Cir. 1976) (citations omitted), *cert. denied*, 97 S.Ct. 739 (1977).  Here, the district court was faced with a credibility determination, and, after questioning several of the persons potentially involved, determined that there was no evidence of misconduct.  *See United States v. Marrero*, 904 F.2d 251 (5th Cir.), *cert. denied*, 111 S.Ct. 561 (1990).  We find no error in denying these motions.

VIII.  Prosecutorial Misconduct

Defendants argue that the government, by eliciting certain testimony, engaged in misconduct so egregious as to require

---

[29]  Michael Castillo maintained that he overheard this remark.

reversal of the convictions.  First, the government elicited testimony from a law enforcement official that one of the prosecutors was to be named "Prosecutor of the Year" by the Texas Narcotics Officers Association.[30]  Second, the government elicited testimony regarding the steps that must be taken to secure a wiretap which allegedly suggested that the issuing judge endorsed the government's case.[31]  Third, the government elicited testimony

--------

[30]  The testimony at issue was elicited as follows:

> "Q:  All right.  Just very briefly, what is the Texas Narcotics Officers Association?"
>
>  . . .
>
> Q:  And you give awards every year for Narcotics Officer of the Year, Prosecutor of the Year, and things like that?
>
> A:  Yes, for those who have done outstanding performance and accomplishments in the field.
>
> Q:  Those awards are going to be given out next week?
>
> A:  Yes, sir.
>
> Q:  Who is Prosecutor of the Year?
>
> A:  Ms. Rose Romero."

A defense objection was immediately made, as well as a motion to strike and to instruct the jury.

[31]  This testimony was the following:

> "Q:  Well, let me ask you this . . . can you just walk into the judge and get your wiretap signed?
>
> A:  . . . First of all, we must get approval for our supervisors to begin to work on a wiretap.  And after we have the approval of our supervisor, we must go to the US Attorney  and talk to them and convince them that there is a need for it and that we have probable cause . . .
>
> Q:  And then once you do this and you go to the US Attorney's

which touched upon the incarceration of particular individuals, thereby allegedly disregarding the court's ruling on a motion *in limine* not to discuss certain prior convictions.[32]

In reviewing a claim that prosecutorial misconduct constituted reversible error, we must determine whether the misconduct casts serious doubt upon the correctness of the jury's verdict. *United*

---

> office and get assigned a prosecutor, do you have to do something else as far as the Department of Justice is concerned?
>
> A:   Yes, ma'am, you do . . . I first have to send it to DEA headquarters for their approval in Washington, DC, and after they have approved it and the US Attorney in the district that I am trying to work the wiretap approves it, we have to send to it [sic] the Department of Justice for their approval, and the Attorney General in Washington has to approve . . .
>
> Q:   And then after all of these people have approved proceeding with this, then what do you do with your application and your affidavit for your wiretap?
>
> A:   I then take it to the judge for his approval.
>
> Q:   And for his signature?
>
> A:   For his signature ordering the wire intercept.

Defense counsel objected to this testimony concerning the steps for obtaining authorization, but the district court overruled the objection.

[32]   Specifically, defendants objected to Ballard's response to the government's question, "When did Sherill Raper start living there at Cozy Lane?"——"After his release, I imagine." Also, defendants objected, and moved for mistrial, based on a government witness' response to the question, "And do you know—did you know—I believe Mr. Brannon also asked you if you knew where Tom Brown, Jr. was at the time you ran the search warrants of August 6, 1993. Do you know where he was?"——"Yes, ma'am, he was in jail."

*States v. Tomblin*, 46 F.3d 1369, 1389 n. 54 (5th Cir. 1995).[33]   For prosecutorial misconduct in the form of improper comment or questioning to represent reversible error, it generally "must be so pronounced and persistent that it permeates the entire atmosphere of the trial."  *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir.), *cert. denied*, 109 S.Ct. 3250 (1989).

Beginning with the testimony elicited by the government regarding Ms. Rose Romero's distinction as "Prosecutor of the Year", this isolated comment—albeit obviously improper—plainly did not permeate the entire atmosphere of the trial, particularly as on the following day the court instructed the jury that this testimony was not pertinent to any issue in the case and admonished the jury to disregard it.  The jury is presumed to have followed this instruction.  *Tomblin*, 46 F.3d at 1390.  The testimony detailing the numerous authorizations obtained by law enforcement officials in securing a wiretap warrant, while more extensive than necessary or desirable, clearly presents no reversible error.  Regarding the reference to Sherill Raper's incarceration, it is clear that Ballard had been instructed by the government not to make any such reference; additionally, the court instructed the jury to disregard this testimony, which plainly did not permeate the entire trial.  Finally, the government's more direct elicitation of testimony

---

[33]     Also, regarding the district court's refusal to grant defendants' motion for mistrial in this context, the district court's ruling will not be set aside absent an abuse of discretion. *United States v. Rocha*, 916 F.2d 219, 234 (5th Cir. 1990) (citation omitted), *cert. denied*, 111 S.Ct. 2057 (1991).

34

pertaining to Thomas Brown, Jr.'s incarceration followed an earlier question in which defense counsel asked the same witness whether he knew that Thomas Brown, Jr. was at work when the search warrant was executed; if the "door" was thereby "opened," then the prosecutor arguably elicited this testimony in good faith. In any event, this exchange cannot be seen to have permeated the entire atmosphere of the trial, nor did the district court abuse its discretion in refusing to grant a mistrial based on this testimony.

Viewing the trial as a whole, and particularly the strength of the evidence against the defendants, we find that any misconduct by the government identified in these claims does not—singly or collectively—constitute reversible error. However, eliciting of testimony before the jury that the lead prosecutor was to be named "Prosecutor of the Year" was wholly unacceptable and unprofessional. Should there be other instances of similarly blatant unprofessionalism, active consideration may have to be given as to whether some form of disciplinary proceeding is appropriate.

IX.  Possession of a Firearm in Connection with the Conspiracy

Michael Castillo contends that the district court erred in enhancing his base offense level by two levels, pursuant to U.S.S.G. § 2D1.1(b)(1), for possession of a firearm in connection with a drug offense. We review this decision by the district court for clear error. *See United States v. Buchanan*, 70 F.3d 818, 827-28 (5th Cir. 1995).

The district court had before it evidence that, during the

35

search of Michael Castillo's home, law enforcement officials seized a .38-caliber Smith and Wesson revolver, handwritten notes that referred to shipments of marihuana, and eighteen pounds of marihuana. The district court concluded that Michael Castillo had been involved throughout the duration of the conspiracy, and that it was reasonably foreseeable to him—and within the scope of his agreement with the other defendants—"that at least a thousand kilograms of marijuana would be trafficked by [his] family." At sentencing, the court overruled defense counsel's objection to this two-level enhancement:

> "As to the gun, and I agree, Mr. Heiskell, if he had a small amount of drugs and he just had a gun in the house that ordinarily without more you wouldn't give the two-point—assess the two-level increase. But when we are dealing with the amounts of drugs that we are dealing with here, thousands of pounds and thousands and thousands and maybe hundreds of thousands of dollars, I just think the inference is too strong. And trips out of state, that the gun had to have been at least somewhat involved in the offense that's alleged. So I will deny that objection."

In *United States v. Mitchell*, 31 F.3d 271 (5th Cir.), *cert. denied*, 115 S.Ct. 455 (1994), this Court observed that Application Note 3 to § 2D1.1 explains that enhancement for possession of a weapon "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.* at 277. Considering that law enforcement officials discovered in Michael Castillo's home not only the gun, but also eighteen pounds of marihuana and notes relating to the conspiracy, the district court's finding—that the gun was "at least somewhat involved in the offense"—was not clearly erroneous. The court

36

certainly could have inferred that Michael Castillo was storing marihuana in his home, in which case the connection between the gun and the conspiracy was not "clearly improbable."[34]

X.    Tramel's Testimony

Defendants argue that the government, under the guise of providing a summary of voluminous records, elicited detailed testimony from DEA Special Agent Tramel that essentially repeated portions of Ballard's previous testimony.  Defendants contend that this abuse of Fed. R. Evid. 1006, to which defense counsel objected at trial, provided the government with an opportunity to bolster Ballard's testimony and to argue its case to the jury through Tramel.

Agent Tramel was the DEA's administrative agent for the wiretap investigation, which was based largely upon the "wire intercepts" of David Castillo's home and mobile telephones.[35] Having established Agent Tramel's predominant role in the wiretap investigation, the government turned to the primary purpose of his testimony.  After reviewing all of the audio tapes, monitor logs,

---

[34]  Michael Castillo contends that the Supreme Court's decision in *Bailey v. United States*, 116 S.Ct. 501 (1995), impacts the present application of section 2D1.1(b)(1) because the Supreme Court construed the term "use" (of a weapon) to require the "active employment" of the weapon by the defendant. *Id*. at 505. However, section 2D1.1(b)(1) contemplates enhancement "[i]f a dangerous weapon (including a firearm) was *possessed*." (Emphasis added). Moreover, the Supreme Court took great pains in *Bailey* to limit its holding to the construction of the term "use" as that term is employed in 18 U.S.C. § 924(c)(1), the statute at issue in *Bailey*. Therefore, *Bailey* does not control the present analysis.

[35]  The investigation also made use of pen registers authorized for the telephones of several of the other defendants.

transcripts of intercepted conversations, relevant telephone company records, and pen registers—all of which were entered into evidence—Tramel created "summary charts" for the government. These charts, which purportedly culled out the relevant telephone calls, dates, and times from the voluminous records amassed during the wiretap investigation, were offered into evidence pursuant to Rule 1006. Tramel's function was to provide the foundation for this summary evidence.

Defendants contend that Tramel's testimony exceeded this limited function, and we are inclined to agree, although that alone is not dispositive, as Tramel could testify in more than one capacity. This Court has recognized that a witness may be called as both an expert on a particular subject and as a fact witness of the events leading to the defendants' indictment. *See United States v. Moore*, 997 F.2d 55 (5th Cir. 1993). Furthermore, the witness may also serve as "an expert *summary* witness", in which capacity the witness may testify regarding his analysis of the subject matter of his expertise, "which may necessarily stem from the testimony of other witnesses." *Id.* at 57-58. Finally, the witness may testify to facts that were "personally experienced" by him, even though this testimony "bolsters" the government's other evidence. *Id.* at 59.

Neither *Moore* nor Rule 1006, nor other recognized principles of evidence, justify all Tramel's testimony. Some of it—such as that concerning what Ballard and Ysidro Castillo did following a telephone call or that Thomas Brown, Jr. picked up Ballard's

38

vehicle at the Holiday Motel (see note 16, *supra*), had nothing to do with summarizing any documents or records,[36] was not anything observed or personally known by Tramel, and was not the basis for any expert opinion expressed by him. Nor was the subject matter of these aspects of Tramel's testimony—or, unlike the situation in *Moore*, of the case as a whole (apart from a few discrete aspects of it)—of a technical nature as to which specialized knowledge was needed for proper understanding. We decline to put our stamp of approval on this sort of practice, which, in a case of this character, without good reason or real need, unfairly allows one prosecution witness merely to repeat or paraphrase the in-court testimony of another as to ordinary, observable facts, and to do so other than in the context of rendering or explaining the basis of or matters considered in reaching an expert opinion.

Nevertheless, we are unable to conclude that the admission of these portions of Tramel's testimony constituted reversible error here. Tramel did not misstate or put an unfair "spin" on the testimony he repeated or paraphrased, and it was uncontradicted. It was always plain that Tramel was merely referring to what

---

[36]   Rule 1006 provides:

> "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court."

Plainly, this rule does not contemplate summarization of live testimony presented in court.

another witness had testified to, and was not suggesting any other source of information. The government's case was strong and essentially uncontradicted, the only defense evidence being two witnesses as to the good character of Michael Castillo. Accordingly, we reject defendants' contentions on appeal that the trial court's overruling of their objections to specified aspects of Tramel's testimony requires that we order a new trial.

## Conclusion

Defendants have demonstrated no reversible error. Their convictions and sentences are accordingly

AFFIRMED.