**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Burnie ROGERS and Johnny Albert
Callahan, Defendants-Appellants.**

No. 83–1072.

United States Court of Appeals,
Fifth Circuit.

Oct. 31, 1983.

Evelina Ortega, Asst. Federal Public Defender, El Paso, Tex., for Rogers.

Roddy Harrison, Pecos, Tex., for Johnny Callahan.

Sidney Powell and Michael McDonald, Asst. U.S. Attys., San Antonio, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GEE and POLITZ, Circuit Judges:

GEE, Circuit Judge:

The issue of serious consequence in this case is whether sufficient evidence supports the convictions of the defendant Rogers for conspiracy and possession of marihuana with intent to distribute it. Others merit only brief discussion; some none. Viewing the evidence most favorably to the verdicts of conviction, the facts are as follows.

In August 1982, Rogers, his thirteen-year-old son Craig and co-defendant Callahan drove the long road from South Carolina to Midland, Texas, in Rogers' silver-grey Lincoln automobile, making at most one stop.[1] The cost of gasoline and of a motel room where the three spent the night in Midland was borne by Rogers. In Midland, Rogers rented another automobile, a Ford sedan, for Callahan and they proceeded south to Marfa. There they spent the night in a motel room rented, again, by Rogers. The day of August 19 found them at Presidio, Texas, on the Mexican border. From it, they crossed into Mexico, returning in the afternoon. Though at trial counsel for

---

1. Highway maps, which we may notice, suggest a required driving time of about 24 hours.

Rogers represented the long trip as a sightseeing vacation, they visited few if any of the meager number of tourist attractions in the remote and desolate area of West Texas through which they passed—not the Big Bend National Park, not the Permian Basin Petroleum Museum in Midland, not Pinto Canyon, and only possibly the old graveyard in the ghost town of Shafter through which they passed.

Near midnight on August 19, 1982, Wayne Winn, a supervisor for the United States Customs Patrol, was patrolling Highway 170 about three miles upriver and northwest of Presidio when he noticed a pickup truck traveling at high speed downriver, but on the Mexican side of the levee close to the Rio Grande River.[2] A few minutes later he noticed a Ford sedan with Texas license plates traveling in the same direction, approaching him at moderate speed on Highway 170. Winn considered it rare to see cars traveling that remote and sparsely settled area at such a late hour—cars which did not belong to any resident of the area, all of whose vehicles he knew well. He therefore called the Border Patrol headquarters in Marfa to determine whether a sensor device located on the road 20 miles upriver from Presidio had been triggered. It had not. As a result, he suspected that the sedan had reached the road from somewhere within Mexico.

Winn pursued the sedan, but it had apparently speeded up and he was unable to catch it. He therefore called ahead to a Customs Patrol Officer stationed further up the road, who stopped the car at Presidio. Arriving on the scene, Agent Winn determined that Callahan was the driver of the car and that Rogers' young son was a passenger. Plastic bags, which appeared to contain contraband, were seen in the back seat. Callahan voluntarily consented to the search of the car. Two hundred pounds of marihuana were found inside the bags. After seeing Callahan and young Rogers, Winn recalled that earlier in the day he had seen Callahan, Rogers and his son entering from Mexico in the Lincoln and had later seen the Lincoln, an expensive and distinctive vehicle, parked in Presidio.

After seizing the drug, the officers searched the car, finding documents showing that it had been rented by defendant Rogers, as well as clothes belonging to Rogers' son. That same evening or early the next morning Rogers was located in Presidio by another customs agent; he had been searching for his son. No contraband was found in Rogers' car.

### Sufficiency of the Evidence

■ The evidence supporting Rogers' convictions is entirely circumstantial; little or nothing connects him directly to the drug load with which Callahan was apprehended. At present we apply the same test of sufficiency to all types of evidence, reversing only if on the record we conclude that a reasonably minded jury must necessarily have entertained a reasonable doubt of the defendant's guilt.[3]

Viewing the evidence we have recited, the jury was clearly entitled to disbelieve that the defendant's long August journey to the hottest and one of the most desolate spots on the border had sightseeing as its motive. Since the claimed purpose was a subterfuge, it might well reason, the true one must be one that would not bear disclosure: just such a one as was revealed on the part of Callahan by his apprehension. Nor was it unreasonable for the jury to believe that the purpose of Rogers, who bankrolled the excursion and—inexplicably—near their destination rented a second vehicle for Callahan, shared Callahan's motive in making the long trek and had done so from the

---

**2.** Highway 170 runs north along the Rio Grande from the Presidio port of entry, paralleling the river and often approaching it closely, passing known smuggling areas. Thirty miles or so north of Presidio it ends. No road feeds into it above Presidio from either the United States or Mexico; it is a cul-de-sac.

**3.** *United States v. Shaw,* 701 F.2d 367, 394 (5th Cir.1983). At one time, but no longer, we applied a stricter test to circumstantial evidence. *E.g., Kassin v. United States,* 87 F.2d 183, 184 (5th Cir.1937). As that test has been abandoned, there is no occasion to recite it here.

outset. The conclusion that their motives were the same and neither some other dubious one raised by no evidence nor some individual initiative by Callahan is supported by the evidence of the Ford's rental receipt. This required the Ford to be returned to Midland by which time, if the smuggling was his private frolic, Callahan would have to have either disposed of the drug for little incremental value in the border environs or be prepared to explain to Rogers what it was with which he proposed to fill up the trunk of Rogers' Lincoln automobile.

A more disturbing feature of the case is the involvement of the child, Craig Rogers. According to Craig's testimony, Callahan was brought on the trip because "he knew his way around and we didn't." On the evening of Callahan's apprehension, the boy testified, the three of them were at an ice cream parlor in Marfa, over an hour's drive from Presidio, when Callahan told Rogers that he was going to see a friend. Tired of staying with his father, Craig begged to be allowed to go with Callahan, and Rogers at last consented.

Callahan drove to Presidio, which they had left not long before, and from it down some road for five or ten miles, Craig testified. At that point, they "turned off" and waited "for about an hour or two" in the dark. Then he heard somebody whistle and "call Johnny."[4] Callahan told him to stay in the car, but he was too frightened to stay alone and followed Callahan. They met someone who handed them bags. When he asked Callahan what the bags contained, Callahan at first refused to tell him but later told him the truth, cautioning him to tell neither his father, his mother nor anyone else of it. The car loaded with Craig's participation, they departed and were later apprehended. On cross-examination, Craig testified that their excursion to Mexico earlier in the day was for two or three hours, that all three remained together and that neither Rogers nor Callahan met or talked to anyone while there. Leaving Mexico, they returned to Marfa.

Since it is obvious, if the child's account be believed, that the night meeting was prearranged,[5] only two possible states of fact suggest themselves. The first is that Callahan—knowing that he was embarked on a drug-smuggling run—nevertheless agreed to take a bored, pre-adolescent boy along on it, confident that he could either prevent the child from learning the purpose of the excursion or prevent him from telling his innocent father if he did learn of it. This version, the jury might well have concluded, is incredible. The second is that Rogers, knowing the purpose of Callahan's trip, sent his son along on it, either simply to help Callahan with the loading, as protective coloration for the venture, or for both purposes.[6]

This version, too, seems unlikely, given normal assumptions of parental protectiveness. On the undisputed facts, however—that Callahan was going for marihuana, knew before he left that he was going for it, and took Craig along—the jury faced a choice between the two. Either Rogers knew and sent Craig, or Callahan agreed to take Craig on a ride that he, but not Rogers, knew was a smuggling venture. Given the other evidence such as Rogers' bankrolling the entire excursion, his renting of the load car and his presence on a lengthy trip which can scarcely have been taken for its purported purpose of sightseeing, we conclude that the jury could reasonably have concluded that Rogers was a conspirator beyond a reasonable doubt. If so, Callahan's actual possession of the drug was Rogers' constructive possession. Here we see far more than "mere presence": Rogers' presence near the drug pick-up was not "mere," rather, it was the effect of great effort and considerable expense on his part in promoting a long journey all but inexplicable for any other purpose, made chiefly in

---

**4.** Callahan's first name.

**5.** Rendering suspect his testimony that they neither met nor talked to anyone in Mexico.

**6.** A barely conceivable third, that the child knew of Callahan's intentions though his father did not, seems at least as unlikely as the first.

his own automobile, and ending with the capture of his associate in a load car over which he had dominion and had rented for no apparent purpose on the last leg of the journey.

### Denial of Rogers' Severance Motion

■ Before us Rogers asserts that his motion for severance should have been granted by the trial court "based on co-defendants' antagonistic defenses." Unfortunately for this contention, however, no motion on this ground was made to that court.[7] Except in rare and extreme circumstances not present here, we do not address on appeal contentions not made to the trial judge. Nor does our examination of the record indicate a level of antagonism between the defenses so pronounced as to have called for action by the court sua sponte.

### Denial of Callahan's Motion to Suppress

■ Caught red-handed, Callahan complains to us only of the trial court's refusal to suppress the evidence revealed by the stop and search. To sustain a roving patrol stop, it must be established that the agents had "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" to justify stopping the vehicle in the border area. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). In that case, the Supreme Court observed that the following factors, among others, may be considered by agents in deciding whether a stop is warranted: the time of day, characteristics of the area, proximity of the area to the border, the pattern of traffic on the road in question, the agent's previous experience with aliens and contraband traffic, the behavior of the driver or drivers, and the characteristics of the vehicle involved. *Id.* at 885, 95 S.Ct. at 2582. The agent is "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Id. See also United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

■ The circumstances surrounding the observation and apprehension of Callahan's car clearly support the reasonableness of this stop. As we recited at greater length above, Officer Winn was on patrol near midnight in a sparsely populated and lightly traveled area on Highway 170. He observed a pickup truck traveling fast across the Rio Grande River; within two or three minutes after he saw the pickup, a car approached him traveling southeast towards Presidio on Highway 170. Neither vehicle belonged to any of the three residents known to Officer Winn to be living in the area, and neither had come from Ruidoso, Texas, to the west, because no sensor had been triggered. Highway 170 runs parallel to the Mexican border, and the point at which Callahan's car passed Officer Winn is close to a major contraband crossing location. Mexico is separated from Highway 170 by less than one mile at this point.

■ Once the vehicle was stopped, the officer observed black plastic bags containing marihuana in the back seat. Seeing these packages of marihuana in plain view, he had probable cause to seize the contraband. *Texas v. Brown,* —— U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). In addition, appellant Callahan voluntarily consented to the search of the car. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Both stop and search were valid.

### Conclusion

Examining Rogers' other points for reversal with care, we conclude that they lack merit and do not require discussion. The convictions of Rogers and Callahan are

AFFIRMED.

---

7. Severance was urged, and twice orally renewed or reurged, on two grounds. The first was that Rogers proposed to testify in his own defense and wished, in that event, to comment on Callahan's silence. The second ground was claimed prejudice to Rogers arising from an asserted great disparity in the weight of the evidence against him as opposed to that against Callahan.