IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 96-50757

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PABLO SALINAS BRITO; ADRIAN BRITO;
JESUS SALINAS BRITO; ADAN BRITO; IGNACIO
BERUMEZ BRITO; BENJAMIN HERNANDEZ RODRIGUEZ,

Defendants-Appellants.

Appeals from the United States District Court for the
Western District of Texas

February 27, 1998

Before POLITZ, Chief Judge, and GARWOOD and BARKSDALE, Circuit
Judges.

GARWOOD, Circuit Judge:

Defendant-appellants Pablo Salinas Brito (Pablo), Adrian Brito
(Adrian), Jesus Salinas Brito (Jesus), Adan Brito (Adan), Ignacio
Berumez Brito (Ignacio), and Benjamin Hernandez Rodriguez
(Rodriguez)(collectively, appellants), were convicted of conspiracy
and various substantive offenses arising out of their drug
importation and distribution enterprise. On appeal, the appellants
raise various constitutional issues and challenge, *inter alia*, the
sufficiency of the evidence, the admissibility of certain evidence,
and the district court's sentencing findings as to the amount of

marihuana involved in the offenses.

## Facts and Proceedings Below

The appellants' convictions are all related to a drug smuggling organization (the Organization or the Brito gang) that, according to the government's evidence,[1] over the course of several months moved thousands of pounds of marihuana from Mexico to Midland, Texas, where it was further distributed to other locations in the interior of the United States. The Organization was directed by the Britos, who oversaw the transportation and storage of the drugs and actively participated in recruiting, supplying, and escorting the drivers of the drug shipments.

In March 1995, the Organization was exposed when one of the drug shipments was intercepted by law enforcement officers. In the months that followed, more shipments were intercepted, and numerous individuals recruited by the Brito gang were arrested. By late November 1995, after numerous arrests and seizures, the smuggling operation was effectively shut down and the conspiracy came to an end. Appellants and other co-conspirators were charged together in a twenty-count indictment and convicted by a jury in the Western District of Texas. Much of the evidence at trial was provided by co-conspirators who pleaded guilty and testified against appellants.

The smuggling conspiracy began to unravel on March 15, 1995, when a Border Patrol agent stopped a car near Marathon, Texas,

---

[1] None of the appellants testified or presented any significant evidence.

2

driven by Herb Groessel (Groessel). The car contained approximately 448 pounds of marihuana destined for Midland, Texas. After Groessel and his passengers, Richard Olson (Olson) and Misty Wheeler, were arrested, they agreed to cooperate with law enforcement officials by delivering the marihuana as planned. Under the watchful eye of law enforcement agents, Groessel left the car containing the drugs at his parents' house in Midland. The car was later picked up by Juan Leija, escorted by Angel Lerma;[2] it was Angel Lerma who had initiated this trip by giving Groessel $2000 and instructing him to go to Boquillas, Mexico, to pick up the drug load.

Groessel told law enforcement officers, and later testified at trial, that he smuggled drugs for Pablo. Olson also believed that he was smuggling drugs for Pablo. But despite their belief that Pablo was the leader of the Brito gang and was behind their smuggling trips, neither Groessel not Olson had much contact with Pablo. Angel Lerma gave Groessel instructions on when and where to go pick up the shipments, and upon returning to Midland he was paid by Jesus and Adan in cocaine and cash. Groessel saw Pablo a couple of times in Mexico while picking up drug loads, and on occasion Pablo would act as a "jammer"[3] for the marihuana loads.

Groessel testified that he ran drugs about eighty times and

_____

[2] As of trial, Angel Lerma was a fugitive from justice.

[3] A jammer drives quickly ahead of the vehicle that is carrying the marihuana load in an attempt to direct attention away from that vehicle and onto himself.

3

transported cash twice for Angel Lerma and Pablo. Olson, on the other hand, was a novice and had just started smuggling drugs two weeks before he was arrested. He testified that he had once accompanied Groessel to Mexico in order to pick up a load of drugs, but for one reason or other, they did not receive the drug load and returned empty-handed. On at least one other occasion, however, Groessel and Olson did manage to successfully transport a load to Merkel, Texas.

On July 9, 1995, police officers made another drug bust. Juan Munoz (Munoz), a confidential informant, told Odessa Police that he was carrying forty-eight pounds of marihuana for delivery in Midland. Police followed Munoz, who was driving a white Ford, to a store in Odessa, where he placed a call on a pay phone. Shortly thereafter, police observed a maroon Dodge pickup truck arrive. The driver of the truck, later identified as Pablo, briefly spoke with the informant, returned to his truck, and drove off, followed by the informant in the white Ford. The maroon pickup truck appeared to be "running heat" or checking for surveillance.

A short while later, the two vehicles stopped at a gas station and another individual, Bumaro Ortega (Ortega), entered the white Ford and drove it to Pablo's house. Ortega left the car, with the drugs in the trunk, in Pablo's backyard and disappeared into Pablo's house. Police approached the house and received Pablo's wife's consent to search the house for Ortega, who was found hiding upstairs. Ortega then gave the police consent to search the white Ford. As expected, the car contained approximately forty-eight

4

pounds of marihuana.  Pablo's truck was also stopped, but he was not carrying any drugs.

On August 16, 1995, David Tovar (Tovar) and Evaristo Galindo (Galindo), were arrested in Crane, Texas, for transporting 320 pounds of marihuana for the Brito gang.  Tovar and Galindo had been recruited as drivers by Oscar Salinas (Salinas), who was himself a driver for the Brito gang and had been instructed by Adan to find more drivers.  After the two young recruits were arrested, Adan gave money to Salinas to pass on to the boys' parents.

Salinas was well connected to the Brito gang; he knew Ignacio from school, and he had met all of Ignacio's family members.  Based on his conversations with Ignacio and his family members, Salinas learned that they were in the business of selling marihuana.  According to Salinas, despite the fact that the Brito brothers considered each other equals, Pablo was the leader of this marihuana enterprise.

Being well acquainted with the Britos and needing money, Salinas asked Adan if he could sell drugs for the Brito gang.  Adan agreed and sold some marihuana to Salinas, who then sold it to others.  Later, Salinas asked Adan if he could transport drugs for the brothers.  The brothers were hesitant to allow him to transport drugs since Pablo, Adrian, and Jesus did not trust Salinas.  Eventually however, they offered Salinas $4000 to transport a load.

For this first trip, Salinas was instructed by Adan that he would have to procure a car and drive to La Linda, a small town near Big Bend National Park, to pick up the drugs.  Escorted by

5

Ignacio and Rodriguez and accompanied by his brother-in-law, Nick Avila, Salinas drove his father-in-law's old Pinto to Mexico.  In Mexico, Salinas told inquiring Federales that the Britos had sent him.  Satisfied with this response, the Federales let him continue.

In Mexico, 280 pounds of marihuana were loaded into the trunk and backseat of Salinas' car.  Escorted by Ignacio and Rodriguez, who ensured that no police were in front of or behind the load vehicle, Salinas drove back to Midland to Jesus's house, where the drugs were ultimately unloaded and placed in a shack behind the house.  After this trip was successfully completed, Salinas was paid by Adan in cash and drugs.

Satisfied by his performance, Adan asked Salinas several more times to transport drug loads for the Britos.  Salinas agreed and over the next several weeks he not only made trips to Mexico to smuggle drugs back to the Midland area, but he also transported drugs from Midland to other places in Texas.  For these trips, Salinas was usually escorted by Ignacio and Rodriguez, received payment and instructions from Adan, and delivered the drug shipments to Jesus.  In addition to transporting the drugs, Salinas, on at least one occasion, delivered $40,000 cash to Adan.

A fourth seizure of drugs belonging to the Britos occurred on October 19, 1995, and led to the arrest of Salinas.  For this trip, Salinas obtained a gray Lincoln Town Car, which he took to Igancio's house so Pablo, Adrian, Jesus, and Adan could see it.  He then drove to Mexico where the car was loaded with marihuana.  At around this same time, Border Patrol agents received information,

6

based on a confidential informant's tip, that a gray Lincoln Town Car, driven by Salinas, would be smuggling a load of drugs from Mexico. On October 19, 1995, law enforcement officials spotted the Lincoln, driven by Salinas. The car was escorted by Ignacio in a green pickup truck and by Rodriguez and his wife in a blue pickup truck. Upon seeing the police cars, the Lincoln sped away from the law enforcement officers and crashed into an embankment. After the crash, Salinas fled, but was later apprehended. The Lincoln was searched and 278 pounds of marihuana were found in its trunk.

The final drug seizure occurred on November 19, 1995, when a pickup truck registered to Adrian, driven by Gustavo Manriquez (Manriquez), was stopped and searched. The search uncovered 120 pounds of marihuana hidden in a secret compartment in the bed of the truck. This ill-fated trip was directed by Pablo, who instructed Carlos Valdez (Valdez) to take Adrian's truck to San Vicente, Mexico. Valdez knew that the truck had a secret compartment and knew that the purpose of the trip was to transport a load of marihuana back to Midland. Pablo accompanied Valdez down to Mexico and instructed him to bring a roll of cellophane for packaging marihuana. Once in Mexico, Pablo left with the truck. On the return trip to the United States, Manriquez drove the truck with the drugs and Valdez accompanied Adrian and Pablo in an escort vehicle. This escort vehicle, a Pontiac Grand Am driven by Adrian, was stopped a few minutes before the drug-laden truck was stopped. As they were being pulled over, Pablo announced to the other occupants of the car that they were going to get "busted" because

7

the truck behind them contained drugs.  The agent searched their car, but after a drug-sniffing dog failed to detect any drugs, the three men were allowed to continue.  Shortly thereafter, the truck driven by Manriquez was stopped, and the drugs were discovered.

On May 30, 1996, a grand jury indictment was returned against the six appellants charging twenty violations of the Title 21 Controlled Substances Act and the Title 18 Racketeering Act.[4]  All appellants were charged in Count Two with conspiracy to import marihuana in violation of 21 U.S.C. § 963, and in Count Three with conspiracy to possess with intent to distribute marihuana in violation of 21 U.S.C. § 846.  Additionally, they were each charged with several substantive offenses.

Pablo was also charged in Count One with engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848; in Counts Four, Six, Eight, Ten, and Thirteen with possession with intent to distribute marihuana, in violation of 21 U.S.C. § 841 (a)(1) and aiding and abetting, in violation of 18 U.S.C. § 2; in Count Eleven with enticing a minor to possess with intent to distribute marihuana, a violation of 21 U.S.C. § 861(a)(1); in Count Fourteen with conspiring to launder money, in violation of 18 U.S.C. § 1956(h); and in Counts Fifteen through Twenty with money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (B)(i) & 2.  On July 17, 1996, prior to trial, the United States moved for

---

[4]

The indictment also charged fourteen other individuals who are not appellants in this case.  Several of these other charged persons pleaded guilty and cooperated with the government as witnesses at the trial.

8

dismissal, and the court dismissed Count Eleven of the indictment due to the unavailability of an essential witness. Following a jury trial, Pablo was convicted on all remaining counts in which he was charged. Pablo requested that his conviction on either the conspiracy count or the continuing criminal enterprise count be vacated as violative of double jeopardy. The United States conceded that Count Three, conspiracy to possess with intent to distribute, had to be vacated, and accordingly the court dismissed Count Three as to Pablo only. Pablo was then sentenced to 492 months' imprisonment followed by five years of supervised release; he was also ordered to pay a fine.

Adrian was also charged in Count Thirteen with possession with intent to distribute marihuana, in violation of section 841(a)(1), and aiding and abetting, in violation of section 2. Adrian was convicted on all 3 counts and sentenced to 156 months' imprisonment followed by 5 years of supervised release.

Jesus was also charged in Counts Eight and Ten with possession with intent to distribute marihuana, in violation of section 841(a)(1), and aiding and abetting, in violation of section 2. Jesus was found guilty on all 4 counts and sentenced to 168 months' imprisonment followed by 5 years of supervised release.

Adan was also charged in Counts Eight and Ten with possession with intent to distribute marihuana, in violation of section 841(a)(1), and aiding and abetting, in violation of section 2. Adan was convicted on all 4 counts and sentenced to 144 months' imprisonment followed by 5 years of supervised release.

9

Ignacio was also charged in Count Nine with importation of marihuana, in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and aiding and abetting, in violation of section 2; and in Count Ten with possession with intent to distribute marihuana, in violation of section 841 (a)(1), and with aiding and abetting, in violation of section 2. He was found guilty on all 4 counts and sentenced to 120 months' imprisonment and 5 years of supervised release.

Rodriguez was also charged in Count Nine with importation of marihuana, in violation of section 952(a), 960(a)(1), and aiding and abetting, in violation of section 2; in Count Ten with possession with intent to distribute marihuana, in violation of section 841(a)(1), and with aiding and abetting, in violation of 18 U.S.C. § 2; in Count Fourteen of a money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and in Count Fifteen with money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (B)(i), & 2. He was found guilty on all 6 counts and sentenced to 120 months' imprisonment followed by 5 years supervised release.

All six appellants filed timely notices of appeal.

## Discussion

On appeal, appellants assert the following claims of error: (1) 21 U.S.C. § 848(c) is void for vagueness and the jury was not properly instructed on the definition of "substantial income and resources;"[5] (2) the district court was required by the "rule of lenity" to vacate Pablo's continuing criminal enterprise conviction

---

[5] Raised by Pablo.

10

where he was also convicted of a lesser included offense that was dismissed at the government's election;[6] (3) the evidence was insufficient to support the conviction of Pablo for engaging in a continuing criminal enterprise under section 848(c);[7] (4) the evidence was insufficient to support the convictions of Jesus and Adrian for conspiracy to import marihuana and conspiracy to possess with intent to distribute, and the evidence was insufficient to support their convictions for possession with intent to distribute;[8] (5) it was error that one conspiracy was charged in the indictment, but evidence was produced at trial reflecting multiple conspiracies;[9] (6) it was an abuse of discretion to admit testimony by a police officer concerning profile evidence of family drug gangs and assigning roles within family drug gangs to various members of the Brito gang;[10] (7) it was an abuse of discretion to admit evidence concerning a small amount of marihuana recovered from the toilet at Adan's house;[11] (8) it was an abuse of discretion to admit evidence concerning the sale of marihuana by Ignacio to

---

[6] Raised by Pablo.

[7] Raised by Pablo.

[8] Raised by Adrian and Jesus.

[9] Raised by Adrian.

[10] Raised by Adrian, Jesus, Ignacio, and Adan.

[11] Raised by Adan.

11

Salinas;[12] (9) the district court should have granted the motion for new trial based on jury misconduct;[13] (10) the post-conviction filing of an amended notice of enhanced penalty amounted to a denial of the defendants' confrontation rights;[14] (11) the quantity of marihuana, for which each defendant was held accountable, was not properly determined.[15] We consider these issues in that order.

I.  Continuing Criminal Enterprise

Pablo was indicted and convicted for engaging in a continuing criminal enterprise (CCE) in violation of section 848.[16] The essential elements of the offense are:  (1) that Pablo committed either of the conspiracy offenses charged in Counts Two or Three; (2) that the violation of either such count was part of a continuing series of violations of federal narcotics laws; (3) that

---

[12]
Raised by Ignacio.

[13]
Raised by Jesus, Adan, and Rodriguez; adopted by Adrian in Notice of Adoption pursuant to Federal Rule of Appellate Procedure 28(i).

[14]
Raised by Jesus and Rodriguez; adopted by Adrian in Notice of Adoption pursuant to Federal Rule of Appellate Procedure 28(i).

[15]
Raised by Adrian, Jesus, Rodriguez, Pablo, and Adan.

[16]
Count One of the indictment reads, in pertinent part, as follows:

> "Defendant **PABLO SALINAS BRITO** undertook such continuing series of violations in concert with five or more persons, whom are listed in COUNT THREE of the Indictment and with respect to whom Defendant **PABLO SALINAS BRITO** occupied a position of organizer; supervisory position; and a position of management, and from which violations Defendant **PABLO SALINAS BRITO** obtained substantial income and resources."

12

Pablo undertook to commit such series of offenses in concert with five or more persons; (4) that Pablo occupied a position of organizer or supervisor, or other management position over those five or more persons; (5) and that Pablo obtained substantial income or resources from the continuing series of violations.[17]

Pablo raises two issues concerning the phrase "substantial income or resources," found in the continuing criminal enterprise provision at section 848(c)(2)(B). First, Pablo argues that the district court failed to properly instruct the jury on the definition of the phrase, and second, he argues that the phrase is so vague that it renders the statute unconstitutional. We reject

---

[17]

21 U.S.C. § 848 provides, in relevant part:

"**(c) 'Continuing criminal enterprise' defined**

For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources."

13

both arguments.

A.    Jury Instruction

Pablo contends that the jury was not adequately instructed because the court did not define the term "substantial" with a specific dollar figure.  Rather than using a dollar figure, the district court followed the Fifth Circuit's Pattern Jury Instructions and defined "substantial income or resources" as follows:  "The term 'substantial income or resources' means income in money or property which is significant in size or amount as distinguished from some relatively insignificant, insubstantial, or trivial amount."   Fifth Circuit Pattern Jury Instructions (Criminal), Instruction No. 2.90 (1997 Ed.).

As a general rule, a jury instruction must define the factual issues and clearly instruct the jurors as to the principles of law they are to apply.   *See United States v. Wolfson*, 573 F.2d 216 (5th Cir. 1978).   However, the trial judge need not define statutory terms unless they are highly "technical or specific," or "outside the common understanding" of jurors.  *United States v. Chenault*, 844 F.2d 1124, 1131 (5th Cir. 1988).   While a definition of the term "substantial" may in some circumstances aid the jury, in *United States v. Johnson*, 575 F.2d 1347, 1358 (5th Cir. 1978), we held that the term "substantial," as it is found in section 848, required no definition in the context of that case.   In this case, the court opted to define the term in question, but fell short of giving a bright line with specific monetary figures that could be considered substantial.

14

In the context of this section 848(c) prosecution, the definition, as given by the court, adequately informed the jurors on the factual issues and principles of law present in the case and the court was not required to supplement its definition of "substantial income and resources" with specific monetary figures. We reject Pablo's complaint concerning the district court's definition.

B.   Constitutionality of Section 848(c)

Pablo further contends that because of the ambiguity inherent in the term "substantial," the statute is unconstitutionally vague. This Court has specifically held that section 848 is not unconstitutionally vague on its face. *See Johnson*, 575 F.2d at 1357-58; *United States v. Cravero*, 545 F.2d 406 (5th Cir. 1976). In the context of the CCE statute, the inherent ambiguities of the term "substantial" do not  rise to the level of a constitutional due process deficiency.  Pablo does not challenge the sufficiency of the evidence that he obtained "substantial income or resources" from the drug operation.

The amount of income that a defendant receives by organizing a criminal enterprise does not have the effect of making criminal that which would otherwise be legal, innocent conduct.  This is not a statute which renders felonious the otherwise wholly innocent operation of, say, a farm, if, but only if, the operator "obtains substantial income or resources therefrom."  Instead, receiving substantial income from a criminal enterprise merely enhances the punishment for engaging in activities that are clearly serious

felonies regardless of the income derived. The due process concern of giving individuals sufficient notice as to what activities are prohibited is simply not an issue in this case. In practical effect, the CCE "substantial income" provision enhances the penalty for otherwise serious felonies. That this particular provision is included as an element of the offense, rather than merely as a sentencing factor, only enhances the protections afforded the defendant.

We hold that this challenged provision of the CCE statute is not unconstitutionally vague or violative of due process. We therefore reject Pablo's contentions in this respect.

II. Dismissal of Lesser Included Offense

Pablo was found guilty of continuing criminal enterprise (Count One) as well as conspiracy to possess marihuana with intent to distribute (Count Three). Since conspiracy to distribute a controlled substance is a lesser included offense of CCE, *see Rutledge v. United States*, 116 S.Ct. 1241 (1996), the government moved to dismiss Count Three on the grounds of double jeopardy. Over Pablo's objection that the greater offense should be dismissed, the court granted the government's motion and dismissed the lesser included offense.

Pablo now argues that the dismissal of the lesser count violated the rule of lenity. The rule of lenity, however, is inapplicable to this issue; it is a rule of statutory interpretation that dictates that statutory ambiguities be resolved in favor of leniency and prohibits a court from interpreting an

16

ambiguous statute in a way that maximizes the penalty. *See Bifulco v. United States*, 100 S.Ct. 2247, 2252 (1980); *United States v. Sayklay*, 542 F.2d 942, 944 (5th Cir. 1976). Since the question before us does not involve any statutory interpretation, the rule is inapplicable to this issue.

It is well settled that in cases of double jeopardy arising from the simultaneous charging of a greater and a lesser included offense, we dismiss the lesser included offense. *See United States v. Wilson*, 116 F.3d 1066, 1087 (5th Cir. 1997); *United States v. Fields*, 72 F.3d 1200, 1209-10 (5th Cir. 1996); *United States v. Tolliver*, 61 F.3d 1189, 1223 (5th Cir. 1995). The *Rutledge* decision has not placed this practice in question.

In *Rutledge*, the Court held that since section 846 is a lesser included offense of section 848, the double jeopardy clause prohibits imposing punishment for both offenses. *Rutledge*, 116 S.Ct. at 1250-51. Accordingly, the Court ordered that one of the convictions be vacated and remanded the case to the trial court. *Id*. The Court did not suggest that the greater offense must be dismissed or in any way intimate that leniency was to be taken into consideration.

Because the rule of lenity is inapplicable in this situation and the law is clear that the lesser, rather than the greater, offense should be vacated in this context, we find no error in the court's dismissal of Count Three, rather than Count One, as to Pablo.

III. Sufficiency of the Evidence

Pablo, Jesus, and Adrian all contend that the evidence was insufficient to support their convictions on several counts. In reviewing challenges to the sufficiency of the evidence, we view the evidence in the light most favorable to the jury's verdict and affirm if a rational trier of fact could have found that the government proved all essential elements of a crime beyond a reasonable doubt. *See United States v. Puig-Infante*, 19 F.3d 929 (5th Cir. 1994). Credibility determinations and reasonable inferences are resolved in favor of the jury's verdict. *Id.*

A.   Pablo

Pablo challenges the sufficiency of the evidence supporting his conviction for continuing criminal enterprise under 21 U.S.C. § 848. Pablo's sole contention is that he did not occupy a position of organizer, supervisor, or other management position with respect to five or more persons as required by section 848(c)(2)(A). We disagree and hold that the evidence was sufficient.

It is not required that the defendant acted with all five persons at the same time or that he occupied the same position with respect to all five persons. *See United States v. Phillips*, 664 F.2d 971, 1013 (5th Cir. 1981). Neither is it required that he have been the sole or dominant organizer, supervisor, or manager of the enterprise. *See United States v. Michel*, 588 F.2d 986, 1000 n.14 (5th Cir. 1979).

The evidence is sufficient to support the reasonable inference that Pablo was a manager, supervisor, or organizer of at least five

18

members of the Britos' smuggling enterprise. Groessel, a driver for the Brito gang, characterized Pablo as the "boss," the "head guy," and the "main man." Another driver, Olson, stated that he was transporting marihuana and cash for Pablo. The incident on July 9, 1995, where Munoz met Pablo and drove a small load of drugs to Pablo's house, while Pablo checked for surveillance, indicates Pablo's control over Munoz. Salinas also perceived Pablo as the leader and observed him with items for bribing Mexican Federales. Later, Valdez personally observed Pablo bribing the Federales. These bribing activities support the fact that Pablo had a leadership role in the organization. According to Valdez, not only did Pablo bribe the Federales, but he also supervised the trip in November when Manriquez was stopped. That trip was initiated by Pablo, who told Valdez to take Adrian's truck to Mexico and asked him to bring along a roll of cellophane for wrapping marihuana. Clearly, Valdez was under Pablo's control and supervision. Additionally, Pablo supervised Rodriguez. Rodriguez used various vehicles belonging to Pablo and even received a Dodge truck paid for by Pablo, but registered in Rodriguez's name.

At a minimum, a jury could have inferred that Pablo supervised, organized, or managed five individuals associated with the gang (Groessel, Olson, Munoz, Valdez, and Rodriguez). Additionally, the fact that several witnesses identified Pablo as the leader, supports an inference that he controlled more than just those five members of the enterprise. We reject Pablo's challenge to the sufficiency of the evidence to support his CCE conviction.

19

B.    Jesus

1.    Conspiracy

Jesus challenges the sufficiency of the evidence supporting his convictions for conspiracy to import marihuana (Count Two) and conspiracy to possess marihuana with intent to distribute (Count Three).  Necessary elements of the charged conspiracies are: (1) the existence of an agreement to import marihuana or to possess marihuana with the intent to distribute, (2) knowledge of the agreement, and (3) voluntary participation in the agreement.  *See United States v. Mergerson*, 4 F.3d 337, 341 (5th Cir. 1993).  Although mere association or presence by themselves are insufficient to prove knowing participation in the agreement, *see United States v. Vergara*, 687 F.2d 57, 61 (5th Cir. 1982), when combined with other relevant circumstantial evidence these factors may constitute sufficient evidence to support a conspiracy conviction.  *See United States v. Williams-Hendricks*, 805 F.2d 496, 503 (5th Cir. 1986).  Thus, a conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence.  *Id.*

The evidence in this case clearly establishes a relationship between Jesus and the other defendants.  In addition, the conviction is supported by circumstantial and direct evidence that Jesus was a knowing and voluntary member of the Britos' drug conspiracy.

The evidence shows that Jesus actively participated in the storage of marihuana.  Salinas testified that he dealt mainly with

Jesus and Adan, and on his first smuggling trip Salinas took the load to Jesus's house where the marihuana was unloaded and stored. On his second trip, Salinas initially took the drugs to his own house, but later Jesus and Adan came by and took the drugs to Jesus's house. On another occasion, Jesus provided Bumaro Ortega with keys to a storage unit for storing a load of drugs.

The evidence is adequate to support a reasonable inference that Jesus was a knowing and voluntary member of the conspiracies to import and distribute marihuana. We reject Jesus's challenge to the sufficiency of the evidence on the conspiracy counts.

2. Substantive Offenses

Jesus also contends that the evidence was insufficient to support his convictions on Counts Eight and Ten for possession of marihuana with intent to distribute on August 16, 1995, and on October 19, 1995, in violation of section 841(a)(1). Possession may be actual or constructive and may be joint with other co-perpetrators; "constructive possession is 'the knowing exercise of, or the knowing power or right to exercise, dominion and control over the proscribed substance.'" *United States v. Gardea Carrasco*, 830 F.2d 41, 45 (5th Cir. 1987). *See also United States v. Wilson*, 657 F.2d 755, 760 (5th Cir. 1981), *cert. denied*, 455 U.S. 952 (1982).

There is no evidence that Jesus had either actual or constructive possession of the drugs transported on the days in question. With regard to the August 16, 1995, transaction, Jesus's only role appears to have been that he and Adan advised Salinas to

21

find additional drivers. The additional drivers, Tovar and Galindo, then drove the load vehicle, and Salinas and Avila escorted them. There is no evidence that Jesus accompanied them on this trip or ever took possession of the drugs. With regard to the October 16, 1995, trip, all Jesus did was inspect and approve a vehicle that was later used to transport the shipment. The government has not produced sufficient evidence to support Jesus's conviction on either of these two substantive counts.[18]

We therefore reverse Jesus's convictions and sentences on both Counts Eight and Ten.[19]

C. Adrian

1. Conspiracy

Adrian, like Jesus, challenges the sufficiency of the evidence supporting his conspiracy convictions on Counts Two and Three.

There was both direct and circumstantial evidence against Adrian. The truck containing drugs in a secret compartment that was stopped on November 19, 1995, belonged to Adrian. Adrian was one of the occupants of the car that was escorting the truck. On

_____

[18] The government argues on appeal that the conviction could also be affirmed on an aiding and abetting theory. The government's reliance on this theory is misplaced. The jury was not instructed on that theory; therefore we cannot sustain a conviction based upon it. *See United States v. Acosta*, 763 F.2d 671, 681 (5th Cir. 1985); *United States v. Wilson*, 657 F.2d 755, 762-63 (5th Cir. 1981). The theory of *Pinkerton v. United States*, 66 S.Ct. 1180 (1946), is likewise unavailable as the jury was not instructed thereon. *See Acosta*, 763 F.2d at 681.

[19] We detect no reasonably possible prejudice respecting Jesus's sentence on Counts One and Two, the guideline range of which was no higher by virtue of the convictions on Counts Eight and Ten.

22

another occasion, Adrian told Valdez about a van that was being altered to create a secret compartment. Adrian also escorted Groessel on at least one smuggling trip. In addition to this evidence, the government brought forth several other witnesses who connected Adrian to the conspiracy.

We recognize that the testimony provided at trial by Groessel and Salinas suffered some shortcomings. Groessel, for instance, could not identify Adrian in court. And Salinas, an admitted drug addict, appears to have had trouble distinguishing between the names "Adrian" and "Adan." At trial, Salinas corrected statements that he had made to the police incriminating Adrian, on the grounds that he had gotten the names confused and had meant to say "Adan."

The inability of Groessel to identify the defendant goes to the weight and credibility of his testimony, but it does not render such testimony devoid of any probative value. *See Smith v. United States*, 358 F.2d 695, 695 (5th Cir. 1966). So, too, Salinas' drug use and apparent confusion over the names is also a question of credibility, and his testimony is not totally negated thereby. We generally resolve such issues of credibility in favor of the jury's verdict. *See United States v. Gibson*, 55 F.3d 173, 180 (5th Cir. 1995). Moreover, the testimony of Salinas and Groessel was not the only evidence of Adrian's guilt on the conspiracy counts.

We hold that the testimony of Groessel, Salinas, Valdez, and others was, taken together, sufficient to prove that Adrian was a knowing and voluntary member of the conspiracies to import marihuana and to possess with the intent to distribute marihuana.

23

We reject his challenge to sufficiency of the evidence on Counts Two and Three.

    2.    Substantive Offense

Adrian also challenges the sufficiency of the evidence supporting his conviction on Count Thirteen for possessing marihuana with the intent to distribute, in violation of section 841(a)(1), on November 19, 1995. Under this count, the government had to prove: (1) knowing (2) possession (3) with intent to distribute. *See United States v. Ramirez*, 954 F.2d 1035, 1039 (5th Cir. 1992).

That Adrian did not have actual possession of the drugs when they were seized from a hidden compartment in his pickup truck is undisputed. But possession need not be actual; constructive possession suffices and it can be joint with co-perpetrators. *See United States v. Vergara*, 687 F.2d 57, 61 (5th Cir. 1982); *Wilson*, 657 F.2d at 760. Constructive possession exists if the defendant knowingly has dominion and control, or has the power to exercise dominion and control, over the drugs, *see Gardea Carrasco*, 830 F.2d at 45, or if the defendant has knowing dominion and control over a vehicle in which drugs are concealed, *see United States v. Richardson*, 848 F.2d 509, 512 (5th Cir. 1988). There is sufficient evidence indicating that Adrian had constructive possession of the drugs. The drugs that were seized on November 19, 1995, were discovered in a secret compartment in the bed of Adrian's pickup truck. The truck was driven by Manriquez, but it was escorted by Adrian in a second car, accompanied by Valdez and

24

Pablo, who had driven Adrian's truck down to Mexico earlier.

Adrian would have us believe that he was "just along for the ride" and neither exercised nor had any dominion or control over his own pickup truck or the drugs when the seizure occurred. In a similar case, *United States v. Rogers*, 719 F.2d 767, 770-71 (5th Cir. 1983), the defendant and some of his associates embarked on a long trip to the border for no apparent reason. The trip was financed entirely by the defendant, who drove his own car on the trip and bankrolled the entire excursion. On the last leg of the trip, the defendant rented a car, but continued to drive his own car. The trip ended when his associate was arrested for smuggling a load of marihuana in the car that the defendant had rented. This Court concluded that the evidence was sufficient to support a finding of constructive possession and affirmed the conviction of the defendant. We reasoned as follows:

> "Rogers' presence near the drug pick-up was not 'mere,' rather, it was the effect of great effort and considerable expense on his part in promoting a long journey all but inexplicable for any other purpose, made chiefly in his own automobile, and ending with the capture of his associate in a load car over which [the defendant] had dominion and had rented for no apparent purpose on the last leg of the journey." *Rogers*, 719 F.2d at 770-71.

The circumstances in Adrian's case are similar to those in *Rogers*. Given his ownership of the vehicle, his proximity to the vehicle on the day in question,[20] and his failure to ever provide

---

[20] Mere proximity to the controlled substance, without dominion and control, is insufficient to establish constructive possession. *See United States v. Cardenas*, 748 F.2d 1015, 1019-20 (5th Cir. 1984).

any explanation as to the purpose of his trip to the Big Bend area, we hold that the evidence was sufficient to find that he constructively possessed the marihuana.  Intent to distribute may be inferred from the quantity involved.

We hold that there was sufficient evidence supporting Adrian's conviction on Count Thirteen.

IV.  Variance Between the Indictment and Proof at Trial

Adrian contends that the indictment alleged one conspiracy lasting from March to November 1995, but that the evidence presented at trial indicates there were multiple conspiracies, only one of which involved him.  Since this issue has been raised for the first time on appeal, we review it for plain error.  *See United States v. Olano*, 507 U.S. 725 (1993).

In order to determine whether multiple conspiracies existed, we consider three factors:  (1) a common goal, (2) the nature of the scheme, (3) overlapping of participants in the various transactions.  *See United States v. Jensen*, 41 F.3d 946, 956 (5th Cir. 1995).  Based on these factors, we hold that the evidence supports the existence of a single conspiracy in which the co-conspirators, including Adrian, shared the common goal of importing large quantities of marihuana from Mexico for distribution in the United States.  The scheme involved several escort vehicles accompanying single drug-laden vehicles from Mexico to Midland. While some of the participants in the individual trips varied, the evidence supports the inference that the Britos were materially involved throughout the existence of the conspiracy.  We hold that

26

the evidence at trial proved the existence of a single conspiracy in accordance with the indictment.

As a corollary to his argument that there were multiple conspiracies, Adrian argues that he was only involved in the November 19, 1995, transaction. Although the clearest evidence against Adrian was related to the November 19, 1995, transaction, there was evidence supporting Adrian's involvement prior to that date.

We hold that there was adequate evidence of a single conspiracy and of Adrian's involvement as a co-conspirator well before November 19.

V.   Admissibility of Evidence

Several of the appellants argue that some of the evidence presented at trial was inadmissible. Since those appellants properly objected at trial and preserved error on these points, we review the trial court's admission of evidence on an abuse of discretion standard. *See United States v. Speer*, 30 F.3d 605 (5th Cir. 1994).

A.   Detective Bryant's Testimony on Family Drug Gangs

Adrian, Jesus, Ignacio, and Adan contend that Bryant's testimony was inadmissible profile and opinion testimony which impermissibly summarized and bolstered the testimony of other witnesses. Bryant testified generally about the structure of family drug gangs, and, based on the testimony of other witnesses, he ascribed certain leadership roles to the Britos. Pablo was labeled the leader; Adrian was labeled the second-in-command, and

27

the other Britos were labeled recruiters, overseers, and escorts.

Bryant described a profile of family drug organizations and then compared the Britos' actions to that profile. Using the profile, Bryant testified that Pablo was the leader, and assigned other leadership roles to the members of the organization. This type of profile evidence is inadmissible to prove substantive guilt based on similarities between defendants and a profile, *see United States v. Williams*, 957 F.2d 1238 (5th Cir. 1992), and under the circumstances the court abused its discretion in allowing Bryant to testify in this respect over the defendants' objections.

In the course of his profile testimony, Bryant relied on the testimony of other witnesses, especially their conclusions and views about the leadership hierarchy of the Brito gang. We have in the past disapproved of this practice that "without good reason or real need, unfairly allows one prosecution witness merely to repeat or paraphrase the in-court testimony of another as to ordinary, observable facts . . . ." *United States v. Castillo*, 77 F.3d 1480, 1500 (5th Cir. 1996).

In *Castillo*, we held that the error did not merit reversal because the witness did not misstate or put an unfair spin on the testimony that he repeated, and the testimony in question was uncontradicted. *Id.* The witness in *Castillo*, relied on "ordinary, observable facts" put forth by other witnesses. *Id.* Bryant, however, relied on conclusory facts and subjective observations by other witnesses. *Castillo* is thus distinguishable and does not support a finding of harmless error in this case. Nevertheless, we

28

hold that Bryant's testimony was harmless as to Adrian, Jesus, Ignacio, and Adan, the only parties who have complained of it on appeal.

The profile testimony was harmless because there was substantial other evidence supporting the convictions for conspiracy, and Bryant's testimony merely assigned to the Britos roles within an organization to which they clearly belonged. Leadership is not an element of conspiracy, and therefore the fact that they may have been assigned a leadership role was essentially immaterial to their conspiracy convictions. Bryant did not unfairly bolster or summarize any testimony pertaining to the Britos' convictions for conspiracy.

In addition to describing the family drug organization profile, Bryant also testified about the difficulty of obtaining evidence about such an organization. He described the difficulty of infiltrating the organization and explained that the majority of the evidence is gathered from co-conspirators. This testimony was improper because it tended to implicitly suggest to the jury that they should convict the defendants on a lower standard of proof. General difficulty of proof does not justify conviction on any lesser standard than beyond a reasonable doubt. *See, e.g., United States v. Beckner*, ___ F.3d ___ at ___ (No. 97-30285, 5th Cir. Feb. 2, 1998), slip op. 1847 at 1853. We hold, however, that on this record and evidence the error was harmless. The jury was clearly and properly instructed on the burden of proof by the court, and neither the prosecutor (nor Bryant explicitly) asked the jury to

convict the defendants on a lower standard of proof. We presume that the jury followed the court's instructions and applied the proper standard of proof, despite Bryant's testimony.

We specifically note that testimony such as Bryant's is normally inappropriate and inadmissible. In this case, however, the court's error in admitting it was harmless.

B.   Marihuana Recovered from Adan's Toilet

Adan contends that evidence of a small amount of marihuana found in the toilet of his house was irrelevant and prejudicial, and was merely evidence of an extrinsic offense. We agree that the court abused its discretion in admitting this evidence, but the error is harmless and does not warrant reversal.

During a search of Adan's house on May 31, 1996, a bag of marihuana was discovered in the toilet after a young girl left the bathroom. In light of the fact that the indictment did not allege any drug activities after the conspiracy came to an end in November 1995 and the indictment charged the defendant with importing and possessing large quantities of marihuana for distribution, the discovery of a small user-quantity of marihuana after the conspiracy had allegedly ended is irrelevant, extraneous offense evidence. *Cf. United States v. Elliott*, 571 F.2d 880, 911 (5th Cir. 1978) (holding that the government may introduce evidence of other acts committed by conspirators during the life of the conspiracy). As such, it was inadmissible.

The court's erroneous admission of this evidence, however, was harmless in that it did not affect Adan's substantial rights in

30

light of all the evidence. Moreover, the jury was charged that the defendants were not on trial for acts not alleged in the indictment and the government did not refer to this evidence in its closing argument.

C. Sale of Marihuana by Ignacio to Salinas

Ignacio contends that testimony by Salinas concerning the sale and use of marihuana by Ignacio was inadmissible extraneous offense evidence. Salinas testified that he and Ignacio got high together and that Ignacio sold him "dope." Salinas, however, was unsure as to whether these events occurred during or prior to the alleged conspiracy.

Regardless of when these events transpired, the evidence was admissible to show Salinas' relationship to the Britos. The sales and use of marihuana were thus intertwined with the charged conspiracy and were not inadmissible extrinsic evidence. *See United States v. Royal*, 972 F.2d 643, 647 (5th Cir. 1992) (holding that evidence of prior drug transactions and convictions was admissible to show relationship between co-conspirators). The court's admission of this testimony was not error.

VI. Juror Misconduct

Jesus, Adan, Rodriguez, and Adrian contend that the court should have granted a new trial based on juror misconduct. The jury returned a guilty verdict against all the appellants. The unanimity of the verdict was confirmed through a jury poll of each juror individually as to each defendant individually in which each juror separately affirmed that the verdict was that of the

31

particular juror separately as to each defendant. Despite her affirmances during the jury poll, however, a juror later alleged that her verdict was coerced through threats and insults that she received from other jurors, and that the jurors impermissibly discussed punishment and appellate rights. As a result of these allegations, several appellants filed Motions for New Trial, which were denied without a hearing.

Generally, a verdict may not be challenged if the jurors were polled and agreed to the verdict. *See United States v. Straach*, 987 F.2d 232, 241-42 (5th Cir. 1993). This rule prevents courts from delving into the internal deliberations of the jury. However, a juror may impeach the jury's verdict with evidence that the verdict was influenced by *outside* sources. *See Mattox v. United States*, 13 S.Ct. 50 (1892). Federal Rule of Evidence 606(b) specifically prohibits a juror from testifying on any matter that occurred during the jury's deliberations unless it concerns improper extraneous information or outside influence.

We have previously held that pressure from other jurors, such as the "coercion" at issue in this case, is not considered an "outside influence," and an affidavit concerning such pressure is inadmissible. *See Straach*, 987 F.2d at 241-42 (5th Cir. 1993); *United States v. Vincent*, 648 F.2d 1046, 1049-50 (5th Cir. 1981). Because the affidavit in this case merely alleged internal coercion, it was inadmissible to support the Motions for New Trial, and thus the court below did not abuse its discretion in refusing to consider this evidence and denying appellants' motions for new

32

trial.

The affidavit also alleged that the jury improperly discussed extraneous general information concerning sentencing and the defendants' rights of appeal, contrary to the court's specific instructions that they were not to consider punishment. Since there is nothing to suggest this information was brought to the jury's attention by an outside source, the court did not abuse its discretion in denying the Motions for New Trial. *See* Fed. R. Evid. 606(b); *Straach*, 987 F.2d at 242 (holding that although the jury improperly discussed penalties that might be imposed against the defendant, the verdict must stand where there is no evidence that they learned of these matters from an outside source).

VII. Amended Notice of Enhanced Penalty

Rodriguez, Jesus, and Adrian contend that the government's Amended Notice of Enhanced Penalty violated their Sixth Amendment right to confront their accusers. The government's original Notice of Enhanced Penalty notified the defendants that the government would seek an enhanced penalty because the conspiracy involved more than one hundred kilograms of marihuana. After the guilty verdicts were returned, the government filed an Amended Notice of Enhanced penalty alleging that more than one thousand kilograms of marihuana were involved in the conspiracies to import and possess marihuana.

Under the Sentencing Guidelines, a conviction involving one hundred kilograms of marihuana carries a lower base offense level than a conviction involving one thousand kilograms. *See* Drug Quantity Table, U.S.S.G. § 2D1.1(c). Several co-conspirators

33

pleaded guilty and testified against appellants in return for lighter sentences of two to five years. In order to challenge the credibility of the witnesses and potentially expose their ulterior motives for testifying, these co-conspirators were questioned about the sentences that they had avoided by cooperating with the government. At trial it appeared that these lower sentences were in lieu of sentences calculated based on one hundred kilograms. If, however, one thousand kilograms were the appropriate amount, they may have lowered their potential exposure even more.

Because the appellants were not notified before trial that appellants would be sentenced based on one thousand kilograms of marihuana, they assert that therefore they only questioned the witnesses about their ulterior motives based on their avoidance of sentences based on *one hundred* kilograms. Rodriguez, Jesus, and Adrian now contend that the witnesses had even greater motivation to lie since they had avoided much stiffer sentences, and because the government failed to inform them of this greater quantity, they could not adequately cross-examine the witnesses and expose these motives. They contend that this violated their Sixth Amendment rights to cross-examine witnesses and reveal to the jury the witnesses' potential bias and ulterior motives.

There is no evidence, however, suggesting that the witnesses agreed to testify in order to avoid being sentenced based on one thousand kilograms. It appears that the witnesses, like the appellants, assumed that they would be sentenced based on one hundred kilograms. Thus, the fact that the government later sought

34

an even stiffer penalty did not affect the witnesses' original choice to cooperate, rather it merely made it a better choice in retrospect.

Moreover, a notice of enhanced penalty as to appellants—which the government was not required to file before trial, *see United States v. Thames*, 12 F.3d 1350, 1373 (5th Cir.), *cert. denied*, 511 U.S. 1095 (1994)—did not bind the government as to the cooperating witnesses. Appellants had adequate opportunity to cross-examine the witnesses as to any ulterior motives they may have been harboring at the time they testified, and therefore their Sixth Amendment rights were not violated.

VIII.    Sentencing

Pablo, Adrian, Adan, Jesus, and Rodriguez contend that they were improperly sentenced because the court miscalculated the amounts of marihuana involved and that those amounts were misweighed. We review the factual findings of the trial court for clear error. *See United States v. Mejia-Orosco*, 867 F.2d 216 (5th Cir. 1989).

Under the United States Sentencing Guidelines (USSG), sentence is imposed based on the defendant's offense level. For drug trafficking crimes that do not involve serious bodily injury or death, the base offense level is calculated based on the quantity of drugs involved. *See* U.S.S.G. § 2D1.1(a)(3). For a defendant involved in a drug trafficking conspiracy, the quantity includes both the drugs with which the defendant was directly involved and the drugs that can be attributed to him through the conspiracy.

35

*See United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir. 1994); U.S.S.G. § 1B1.3(a)(1).

The defendant will not necessarily be held responsible for the full amount of drugs involved in the conspiracy, rather the defendant will only be held accountable for those amounts of drugs that he knew or reasonably could have known or believed were involved in the conspiracy. *See United States v. Puma*, 937 F.2d 151, 160 (5th Cir. 1991); *United States v. Thomas*, 963 F.2d 63, 65 (5th Cir. 1992) (holding that an individual involved in a conspiracy trafficking large amounts of drugs will be held accountable even for drugs that are beyond his "universe of involvement"). In order to calculate this amount, a court may consider the co-conspirator's role in the conspiracy, his relationship to the other conspirators, and any other information with "sufficient indicia of reliability." *See Puig-Infante,* 19 F.3d at 942.

A.  Pablo

The district court found that Pablo committed offenses involving over 19,000 kilograms of marihuana. This amount, being between 10,000 and 30,000 kilograms, yielded a base level of 36 under the Sentencing Guidelines. The court also added 4 points for the CCE conviction, pursuant to U.S.S.G. § 2D1.5(a)(1), for a base level total of 40. With a base level of 40 and criminal history category III, the court sentenced Pablo to 492 months in prison.

Pablo objected to the court's calculation of the quantity of drugs involved. The court overruled the objection and specifically

adopted the factual statements as to the amount involved from the Presentencing Report (PSR).

Pablo contends that the evidence considered by the court and the PSR for calculating his sentence lacked the requisite "sufficient indicia of reliability."  The majority of the 19,225 kilogram figure was based on the testimony of Groessel, who, after his arrest, told police officers that he had driven as many as 80 loads averaging 500 pounds per load.  At trial, Groessel testified that the loads weighed between 300 and 400 pounds.  Despite this trial testimony, the PSR used the 500 pound estimate and calculated that Groessel had transported 18,144 kilograms for Pablo.[21]

Even if the PSR had used the lowest estimate of the weight per load (300 pounds), the total quantity would still have been greater than 10,000 kilograms.  Thus, any error concerning the weight of the loads was harmless since even the most conservative calculation yields a total over ten thousand kilograms.

Pablo also challenges the veracity and reliability of Groessel's testimony that he transported eighty loads for Pablo. Whenever a defendant challenges the facts contained in the PSR, the court must either make specific findings as to those facts or determine that those facts will not be considered at sentencing. *See* Fed. R. Crim. P. 32.   In order to satisfy Rule 32, the court may make implicit findings by adopting the PSR. *See Puig-Infante*,

---

[21]

This figure was calculated by multiplying 80 times 500 pounds and then converting that figure into kilograms by dividing by 2.2046 lbs./kg.

37

19 F.3d at 943.

At Pablo's sentencing hearing, the court resolved this factual dispute concerning the amount involved by explicitly accepting the factual statements contained in the PSR. The court's findings of fact are subject to a clearly erroneous standard of review, and we find that the court's adoption of the PSR, after having heard all the testimony and having seen all the evidence, was not clearly erroneous.

B. Adrian

The court adopted Adrian's PSR and found that there was proof that there were more than one thousand kilograms of marihuana involved, and hence Adrian had a base level of 32 under the Sentencing Guidelines. Additionally, the court adopted the PSR's finding of a category III criminal history. As a result, Adrian was sentenced to 156 months' imprisonment.

Adrian now contends that he should not have been held accountable for all the drugs involved in the conspiracy from June through November. Adrian was clearly involved with the 120 pound load that was seized on November 19, 1995. However, as a co-conspirator, he can also be held accountable for the other loads even though he did not actively participate in their transportation. Given his level of involvement in the conspiracy, these loads were foreseeable to him, and thus the quantity was properly calculated by the court. The court's findings of fact are subject to considerable deference, and in the absence of a clearly erroneous finding, the sentence must be affirmed. We affirm

Adrian's sentence.

C.   Adan, Jesus, and Rodriguez

Adan was sentenced to 144 months' imprisonment.  The court found that he was involved with over one thousand kilograms of marihuana and set his base level at 32 with a criminal history category of two.  The court made virtually identical findings for Jesus as to weight, but sentenced him to 168 months' imprisonment because of his higher, category four criminal history.

Rodriguez, on the other hand, received a lighter sentence. The court found that Rodriguez was involved with over one thousand kilograms of marihuana, giving him a 32 base level, but reduced the level by two points for being a minor participant.  Thus, with a base level of 30 and category one criminal history, the court sentenced Rodriguez to 120 months' imprisonment, the statutory minimum for conspiring to import and conspiring to distribute over 1,000 kilograms of marihuana in violation of 21 U.S.C. §§ 846 and 963.

Adan, Jesus, and Rodriguez contend that the court's calculation of the quantity of marihuana was erroneously based on the *gross* weight of the marihuana rather than the *net* weight.  Both Adan and Rodriguez specifically raised this issue at the sentencing hearing, while Jesus made a broad objection as to the amounts involved.  The court noted that it could not reweigh the marihuana and found by a preponderance of the evidence that over one thousand kilograms of marihuana were involved.  The court adopted the findings of the PSR and imposed sentence.

The weights given in these appellants' respective PSRs are identified as *net* weights. The mere suspicion by appellants that these are actually gross weights is insufficient to challenge the sentence. Since appellants have provided no specific evidence that these weights are incorrect, we affirm and hold that the court did not err in adopting the PSR's findings.

Adan also contends that Salinas's testimony concerning the amounts of marihuana that he transported is unreliable and that the actual amount is much lower than the 1006 kilograms reflected in the PSR. The 1006 kilogram figure was based on amounts that were actually seized and on the testimony of Salinas concerning loads that he transported. According to Salinas' testimony, (1) the first load that he transported was 280 pounds; (2) the second was 300 pounds; (3) the third was 200 to 250 pounds; (4) he delivered a load worth $40,000 to Fort Worth, which, at $1800 per pound, weighed about 22 pounds; (5) 3 other loads with no estimated weights were also transported; (6) Tovar and Galindo were arrested with 320 pounds; (7) Salinas stored 80 to 100 pounds that were transported by his uncle; (8) Salinas was arrested with 278 pounds of marihuana. The PSR calculated that Salinas's activities in connection with the Brito gang involved a quantity of 1006 kilograms.

To calculate Adan's total involvement, the PSR used this 1006 kilogram figure. The PSR estimated that Adan was involved to the same extent as Salinas and attributed the 1006 kilograms to Adan. Additionally, the PSR found that Adan was involved with the

November 19, 1995, shipment of 54.54 kilograms of marihuana. Adan's total was thus calculated at 1060.54 kilograms. The court adopted this figure and found that the quantity involved was over one thousand kilograms.

Adan failed to offer any affidavits or evidence to rebut the findings of the PSR, hence the court was free to adopt it. *See United States v. Rodriguez*, 897 F.2d 1324 (5th Cir. 1990). We reject Adan's argument that Salinas's testimony was unreliable, and, therefore, we hold that the quantity of marihuana was properly calculated and adequately supported by the record.

For these reasons, we affirm the sentences imposed by the district court.[22]

## Conclusion

We affirm the convictions and sentences of Pablo, Adrian, Adan, Ignacio, and Rodriguez. As to Jesus, we reverse his convictions and sentences on Counts Eight and Ten, but affirm his convictions and sentences on Counts Two and Three.

REVERSED in part; AFFIRMED in part

---

[22] Except Jesus's sentences on Counts Eight and Ten, convictions on which we have reversed.

41